## ON REHEARING EN BANC

### PUBLISHED

### UNITED STATES COURT OF APPEALS
### FOR THE FOURTH CIRCUIT

### No. 20-1001

BONNIE PELTIER, as Guardian of A.P., a minor child; ERIKA BOOTH, as Guardian of I.B., a minor child; KEELY BURKS,

Plaintiffs - Appellees,

v.

CHARTER DAY SCHOOL, INC.; ROBERT P. SPENCER, in his capacity as member of the Board of Trustees of Charter Day School, Inc.; CHAD ADAMS, in his capacity as member of the Board of Trustees of Charter Day School, Inc.; SUZANNE WEST, in her capacity as member of the Board of Trustees of Charter Day School, Inc.; COLLEEN COMBS, in her capacity as member of the Board of Trustees of Charter Day School, Inc.; TED BODENSCHATZ, in his capacity as member of the Board of Trustees of Charter Day School, Inc.; MELISSA GOTT, in her capacity as member of the Board of Trustees of Charter Day School, Inc.,

Defendants - Appellants,

and

THE ROGER BACON ACADEMY, INC.,

Defendant.

------------------------------

NORTH CAROLINA INSTITUTE FOR CONSTITUTIONAL LAW; CIVITAS INSTITUTE, INC.; PAUL B. STAM, JR.,

Amici Supporting Appellants.

NATIONAL WOMEN'S LAW CENTER; A BETTER BALANCE; AMERICAN ASSOCIATION OF UNIVERSITY WOMEN; AMERICAN FEDERATION OF STATE, COUNTY, AND MUNICIPAL EMPLOYEES; AMERICAN FEDERATION OF TEACHERS; ANTI-DEFAMATION LEAGUE; AUTISTIC SELF ADVOCACY NETWORK; BOLD FUTURES; CALIFORNIA WOMEN LAWYERS; CLEARINGHOUSE ON WOMEN'S ISSUES; COALITION OF LABOR UNION WOMEN; DESIREE ALLIANCE; DISABILITY RIGHTS ADVOCATES; DISABILITY RIGHTS EDUCATION & DEFENSE FUND; END RAPE ON CAMPUS; EQUALITY CALIFORNIA; FEMINIST MAJORITY FOUNDATION; FORGE, INCORPORATED; GENDER JUSTICE; GIRLS FOR GENDER EQUITY; GIRLS INC.; GLBTQ LEGAL ADVOCATES & DEFENDERS; HUMAN RIGHTS CAMPAIGN; KENTUCKY ASSOCIATION OF SEXUAL ASSAULT PROGRAMS; KWH LAW CENTER FOR SOCIAL JUSTICE AND CHANGE; LEGAL AID AT WORK; LEGAL MOMENTUM; LEGAL VOICE; NATIONAL ASSOCIATION OF SOCIAL WORKERS; NATIONAL ASSOCIATION OF WOMEN LAWYERS; NATIONAL CENTER FOR TRANSGENDER EQUALITY; NATIONAL COUNCIL OF JEWISH WOMEN; NATIONAL CRITTENTON; NATIONAL NETWORK TO END DOMESTIC VIOLENCE; NATIONAL ORGANIZATION FOR WOMEN FOUNDATION; NATIONAL PARTNERSHIP FOR WOMEN & FAMILIES; NATIONAL WOMEN'S POLITICAL CAUCUS; OKLAHOMA CALL FOR REPRODUCTIVE JUSTICE; PARTNERSHIP FOR WORKING FAMILIES; RELIGIOUS COALITION FOR REPRODUCTIVE CHOICE; SHRIVER CENTER ON POVERTY LAW; SISTERREACH; SOUTHERN POVERTY LAW CENTER; STOP SEXUAL ASSAULT IN SCHOOLS; THE AFIYA CENTER; THE WOMEN'S LAW CENTER OF MARYLAND; TRANSGENDER LAW CENTER; WASHINGTON LAWYERS' COMMITTEE FOR CIVIL RIGHTS AND URBAN AFFAIRS; WOMEN LAWYERS ON GUARD INC.; WOMEN WITH A VISION, INC.; WOMEN'S BAR ASSOCIATION OF THE DISTRICT OF COLUMBIA; WOMEN'S BAR ASSOCIATION OF THE STATE OF NEW YORK; WOMEN'S INSTITUTE FOR FREEDOM OF THE PRESS; WOMEN'S LAW PROJECT; WOMEN'S MEDIA CENTER; WOMEN'S RIGHTS AND EMPOWERMENT NETWORK; WOMEN'S ALL POINTS BULLETIN; NATIONAL EDUCATION ASSOCIATION; NORTH CAROLINA ASSOCIATION OF EDUCATORS; THE SOCIETY FOR RESEARCH IN CHILD DEVELOPMENT; THE SOCIETY FOR THE PSYCHOLOGICAL STUDY OF SOCIAL ISSUES; THE COGNITIVE DEVELOPMENT SOCIETY; THE SOCIETY FOR RESEARCH ON ADOLESCENCE; PROFESSOR RUTHANN ROBSON; UNITED STATES OF AMERICA,

Amici Supporting Appellees.

NATIONAL ALLIANCE FOR PUBLIC CHARTER SCHOOLS,

2

Amicus Supporting Rehearing Petition.

---

### No. 20-1023

---

BONNIE PELTIER, as Guardian of A.P., a minor child; ERIKA BOOTH, as Guardian of I.B., a minor child; KEELY BURKS,

Plaintiffs - Appellants,

v.

CHARTER DAY SCHOOL, INC.; ROBERT P. SPENCER, in his capacity as member of the Board of Trustees of Charter Day School, Inc.; CHAD ADAMS, in his capacity as member of the Board of Trustees of Charter Day School, Inc.; SUZANNE WEST, in her capacity as member of the Board of Trustees of Charter Day School, Inc.; COLLEEN COMBS, in her capacity as member of the Board of Trustees of Charter Day School, Inc.; TED BODENSCHATZ, in his capacity as member of the Board of Trustees of Charter Day School, Inc.; MELISSA GOTT, in her capacity as member of the Board of Trustees of Charter Day School, Inc.,

Defendants - Appellees,

and

THE ROGER BACON ACADEMY, INC.,

Defendant.

------------------------------

NATIONAL WOMEN'S LAW CENTER; A BETTER BALANCE; AMERICAN ASSOCIATION OF UNIVERSITY WOMEN; AMERICAN FEDERATION OF STATE, COUNTY, AND MUNICIPAL EMPLOYEES; AMERICAN FEDERATION OF TEACHERS; ANTI-DEFAMATION LEAGUE; AUTISTIC SELF ADVOCACY NETWORK; BOLD FUTURES; CALIFORNIA WOMEN LAWYERS; CLEARINGHOUSE ON WOMEN'S ISSUES; COALITION OF LABOR UNION WOMEN; DESIREE ALLIANCE; DISABILITY RIGHTS ADVOCATES; DISABILITY RIGHTS EDUCATION & DEFENSE FUND; END RAPE ON CAMPUS; EQUALITY CALIFORNIA; FEMINIST MAJORITY

3

FOUNDATION; FORGE, INCORPORATED; GENDER JUSTICE; GIRLS FOR GENDER EQUITY; GIRLS INC.; GLBTQ LEGAL ADVOCATES & DEFENDERS; HUMAN RIGHTS CAMPAIGN; KENTUCKY ASSOCIATION OF SEXUAL ASSAULT PROGRAMS; KWH LAW CENTER FOR SOCIAL JUSTICE AND CHANGE; LEGAL AID AT WORK; LEGAL MOMENTUM; LEGAL VOICE; NATIONAL ASSOCIATION OF SOCIAL WORKERS; NATIONAL ASSOCIATION OF WOMEN LAWYERS; NATIONAL CENTER FOR TRANSGENDER EQUALITY; NATIONAL COUNCIL OF JEWISH WOMEN; NATIONAL CRITTENTON; NATIONAL NETWORK TO END DOMESTIC VIOLENCE; NATIONAL ORGANIZATION FOR WOMEN FOUNDATION; NATIONAL PARTNERSHIP FOR WOMEN & FAMILIES; NATIONAL WOMEN'S POLITICAL CAUCUS; OKLAHOMA CALL FOR REPRODUCTIVE JUSTICE; PARTNERSHIP FOR WORKING FAMILIES; RELIGIOUS COALITION FOR REPRODUCTIVE CHOICE; SHRIVER CENTER ON POVERTY LAW; SISTERREACH; SOUTHERN POVERTY LAW CENTER; STOP SEXUAL ASSAULT IN SCHOOLS; THE AFIYA CENTER; THE WOMEN'S LAW CENTER OF MARYLAND; TRANSGENDER LAW CENTER; WASHINGTON LAWYERS' COMMITTEE FOR CIVIL RIGHTS AND URBAN AFFAIRS; WOMEN LAWYERS ON GUARD INC.; WOMEN WITH A VISION, INC.; WOMEN'S BAR ASSOCIATION OF THE DISTRICT OF COLUMBIA; WOMEN'S BAR ASSOCIATION OF THE STATE OF NEW YORK; WOMEN'S INSTITUTE FOR FREEDOM OF THE PRESS; WOMEN'S LAW PROJECT; WOMEN'S MEDIA CENTER; WOMEN'S RIGHTS AND EMPOWERMENT NETWORK; WOMEN'S ALL POINTS BULLETIN; NATIONAL EDUCATION ASSOCIATION; NORTH CAROLINA ASSOCIATION OF EDUCATORS; THE SOCIETY FOR RESEARCH IN CHILD DEVELOPMENT; THE SOCIETY FOR THE PSYCHOLOGICAL STUDY OF SOCIAL ISSUES; THE COGNITIVE DEVELOPMENT SOCIETY; THE SOCIETY FOR RESEARCH ON ADOLESCENCE; PROFESSOR RUTHANN ROBSON; UNITED STATES OF AMERICA,

Amici Supporting Appellants.

NORTH CAROLINA INSTITUTE FOR CONSTITUTIONAL LAW; CIVITAS INSTITUTE, INC.; PAUL B. STAM, JR.,

Amici Supporting Appellees.

———————

Appeals from the United States District Court for the Eastern District of North Carolina, at Wilmington.  Malcolm J. Howard, Senior District Judge.  (7:16−cv−00030−H−KS)

———————

4

Argued: December 10, 2021                    Decided: June 14, 2022

———————————

Before GREGORY, Chief Judge, and WILKINSON, NIEMEYER, MOTZ, KING, AGEE, WYNN, DIAZ, THACKER, HARRIS, RICHARDSON, QUATTLEBAUM, RUSHING, and HEYTENS, Circuit Judges, and KEENAN and FLOYD, Senior Circuit Judges.

———————————

Affirmed in part, vacated in part, and remanded by published opinion. Senior Judge Keenan wrote the opinion, in which Chief Judge Gregory and Judges Motz, King, Wynn, Diaz, Thacker, Harris, Heytens, and Senior Judge Floyd joined. Judge Wynn wrote a concurring opinion, in which Judges Motz, Thacker, Harris, and Senior Judge Keenan joined. Senior Judge Keenan wrote a concurring opinion, in which Judge Thacker joined. Judge Quattlebaum wrote an opinion dissenting in part and concurring in part, in which Judges Richardson and Rushing joined, and in which Judges Wilkinson, Niemeyer, and Agee joined dissenting in part. Judge Wilkinson wrote a dissenting opinion, in which Judges Niemeyer and Agee joined.

———————————

**ARGUED:** Aaron Michael Streett, BAKER BOTTS L.L.P., Houston, Texas, for Appellants/Cross-Appellees. Galen Leigh Sherwin, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York, for Appellees/Cross-Appellants. **ON BRIEF:** J. Mark Little, Travis L. Gray, BAKER BOTTS L.L.P., Houston, Texas, for Appellants/Cross-Appellees. Ria Tabacco Mar, Jennesa Calvo-Friedman, Louise Melling, Amy Lynn Katz, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York; Irena Como, ACLU OF NORTH CAROLINA LEGAL FOUNDATION, Raleigh, North Carolina; Jonathan D. Sasser, ELLIS & WINTERS LLP, Raleigh, North Carolina, for Appellees/Cross-Appellants. Jeanette K. Doran, NORTH CAROLINA INSTITUTE FOR CONSTITUTIONAL LAW, Raleigh, North Carolina, for Amicus North Carolina Institute for Constitutional Law. Paul B. Stam, Jr., R. Daniel Gibson, STAM LAW FIRM, PLLC, Apex, North Carolina, for Amici The Civitas Institute, Inc. and Paul B. Stam, Jr. Brian R. Matsui, Aaron D. Rauh, MORRISON & FOERSTER LLP, Washington, D.C., for Amici Society for Research in Child Development, Society for the Psychological Study of Social Issues, Cognitive Development Society, and Society for Research on Adolescence. Alice O'Brien, Eric A. Harrington, Rebecca Yates, NATIONAL EDUCATION ASSOCIATION, Washington, D.C.; Verlyn Chesson-Porte, NORTH CAROLINA ASSOCIATION OF EDUCATORS, Raleigh, North Carolina, for Amici The National Education Association and North Carolina Association of Educators. Emily Martin, Neena Chaudhry, Sunu Chandy, Adaku Onyeka-Crawford, NATIONAL WOMEN'S LAW CENTER, Washington, D.C.; Courtney M. Dankworth, DEBEVOISE & PLIMPTON LLP, New York, New York, for Amici National Women's Law Center and Coalition of Civil Rights and Public Interest Organizations. Jayme Jonat, Nina Kanovitch

5

Schiffer, HOLWELL SHUSTER & GOLDBERG LLP, New York, New York, for Amicus Professor Ruthann Robson.  Kristen Clarke, Assistant Attorney General, Thomas E. Chandler, Jason Lee, Appellate Section, Civil Rights Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Amicus United States.  Christopher A. Brook, PATTERSON HARKAVY LLP, Chapel Hill, North Carolina, for Amicus National Alliance for Public Charter Schools.

---

BARBARA MILANO KEENAN, Senior Circuit Judge:

Charter Day School (CDS),[1] a public charter school in North Carolina, requires female students to wear skirts to school based on the view that girls are "fragile vessels" deserving of "gentle" treatment by boys (the skirts requirement). The plaintiffs argue that this sex-based classification grounded on gender stereotypes violates the Equal Protection Clause of the Fourteenth Amendment, and subjects them to discrimination and denial of the full benefits of their education in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* (Title IX).

In response, despite CDS' status as a public school under North Carolina law, CDS and its management company disavow accountability under the Equal Protection Clause by maintaining that they are not state actors. These entities also assert that Title IX, the federal statute designed to root out gender discrimination in schools, categorially does not apply to dress codes.

Upon our review, we affirm the district court's entry of summary judgment for the plaintiffs on their Equal Protection claim against CDS, and the court's judgment in favor of the management company on that claim. We also vacate the court's summary judgment award in favor of all defendants on the plaintiffs' Title IX claim and remand for further proceedings on that claim.

---

[1] Charter Day School, Inc. operates four charter schools in North Carolina, including Charter Day School. The non-profit entity CDS, Inc. and its trustees, rather than the school itself, are the named defendants in this case. For ease of reference, we will refer to the school, its non-profit parent entity, and the trustees collectively as "CDS" throughout this opinion.

7

I.

CDS, a public charter school in Brunswick County, North Carolina, educates male and female[2] students in kindergarten through the eighth grade. The founder of the school, Baker A. Mitchell, Jr., incorporated defendant Charter Day School, Inc. in 1999. The following year, he obtained a charter from the state of North Carolina, pursuant to the North Carolina Charter Schools Act of 1996, N.C. Gen. Stat. § 115C-218 *et seq.* CDS' policies are established by the volunteer members of its Board of Trustees (the Board). Mitchell initially served as the Board's chairman and now serves as its non-voting secretary.

Enrollment at CDS is open to all students who are eligible to attend North Carolina public schools. *See* N.C. Gen. Stat. § 115C-218.45(a). CDS receives 95% of its funding from federal, state, and local governmental authorities.

After applying for its charter, CDS entered into a "charter school management contract" (the management agreement) with defendant Roger Bacon Academy, Inc. (RBA), a for-profit corporation founded and owned by Mitchell. Under the terms of the management agreement, RBA is responsible for the day-to-day operations of CDS, including hiring school personnel and carrying out the school's education program. CDS maintains a bank account on which RBA is a signatory and from which RBA receives reimbursements for fees and operational expenses.

---

[2] Because the plaintiffs challenge the skirts requirement only as discriminatory toward cisgender girls, we do not address the effects of the policy on any other students.

Since its inception, CDS, at the direction of Mitchell and the Board, has "emphasize[d] traditional values," including a "traditional curriculum, traditional manners and traditional respect." These stated priorities pervade many areas of the school's practices. For example, CDS teaches a "classical curriculum," utilizing a "direct instruction" method. Overall, as one Board member explained, CDS operates "more like schools were 50 years ago compared to now."

As part of this educational philosophy, CDS has implemented a dress code to "instill discipline and keep order" among students. Among other requirements, all students must wear a unisex polo shirt and closed-toe shoes; "[e]xcessive or radical haircuts and colors" are prohibited; and boys are forbidden from wearing jewelry. Female students are required to wear a "skirt," "jumper," or "skort." In contrast, boys must wear shorts or pants. All students are required to comply with the dress code unless they have physical education class, when they wear unisex physical education uniforms, or an exception is made for a field trip or other special event. A student's failure to comply with the dress code requirements may result in disciplinary action, including notification of the student's parent, removal from class to comply with the dress code, or expulsion, though no student has been expelled for violating the dress code.

In 2015, plaintiff Bonnie Peltier, the mother of a female kindergarten student at CDS, informed Mitchell that she objected to the skirts requirement. Mitchell responded to Peltier in support of the policy, stating:

> The Trustees, parents, and other community supporters were determined to preserve chivalry and respect among young women and men in this school of choice. For example, young men were to hold the door open for the young

9

ladies and to carry an umbrella, should it be needed. Ma'am and sir were to be the preferred forms of address. There was felt to be a need to restore, and then preserve, traditional regard for peers.

Mitchell later elaborated that chivalry is "a code of conduct where women are treated, they're regarded as a fragile vessel that men are supposed to take care of and honor." Mitchell further explained that, in implementing the skirts requirement, CDS sought to "treat[] [girls] courteously and more gently than boys."

Peltier and two other CDS parents and guardians, on behalf of their female children (the plaintiffs), filed suit in the Eastern District of North Carolina against CDS, the members of the Board, and RBA (the defendants), alleging violations of the Equal Protection Clause and Title IX.[3] The plaintiffs alleged that the skirts requirement is a sex-based classification rooted in gender stereotypes that discriminates against them based on their gender. The parties later filed cross-motions for summary judgment.

In support of their summary judgment motion, the plaintiffs submitted evidence of the tangible and intangible harms they suffer based on the skirts requirement. One plaintiff testified that the skirts requirement conveys the school's view that girls "simply weren't worth as much as boys," and that "girls are not in fact equal to boys." Another plaintiff stated that the skirts requirement "sends the message that girls should be less active than boys and that they are more delicate than boys," with the result that boys "feel empowered" and "in a position of power over girls."

---

[3] The plaintiffs also alleged state law claims for breach of the charter and a violation of the North Carolina Constitution. These claims are pending in the district court and are not at issue in this appeal.

The plaintiffs also described the impact of the skirts requirement on their ability to participate in school activities. On one occasion, when a first-grade female student wore shorts to school due to a misunderstanding of the dress code, she was removed from class and was required to spend the day in the school's office. The plaintiffs also explained that they avoid numerous physical activities, including climbing, using the swings, and playing soccer, except for days on which they are permitted to wear their unisex physical education uniforms. The plaintiffs further testified that they cannot participate comfortably in school emergency drills that require students to crawl and kneel on the floor, fearing that boys will tease them or look up their skirts. Both parties presented evidence from expert witnesses regarding the effects that the skirts requirement and gender stereotypes have on female students.

The district court concluded that CDS, in imposing and implementing the skirts requirement, was a state actor for purposes of the Equal Protection claim brought under 42 U.S.C. § 1983. The court reasoned that CDS' provision of a free, public education is a function historically and exclusively performed by the state and that, therefore, CDS' conduct fairly is attributable to the state of North Carolina. However, with respect to RBA, the court concluded that RBA does not have a sufficiently close tie to the state to qualify as a state actor. On the merits of the Equal Protection claim, the court held that the skirts requirement violates the Equal Protection Clause. The court therefore granted summary judgment to the plaintiffs on this claim against CDS.

The district court reached a different conclusion regarding the Title IX claim, holding that dress codes categorically are exempt from Title IX's prohibition against

11

gender discrimination.  The court reasoned that when the United States Department of Education rescinded a prior regulation governing dress codes, the Department reasonably had concluded that Congress did not intend for such policies to be subject to Title IX.  The court thus granted summary judgment to the defendants on the Title IX claim.  The district court denied summary judgment without prejudice on the plaintiffs' state law claims and entered partial final judgment on the remainder of the case.

On appeal, a panel of this Court reversed the district court's judgment on both the Equal Protection and the Title IX claims.  *Peltier v. Charter Day Sch., Inc.*, 8 F.4th 251, 257 (4th Cir. 2021), *reh'g en banc granted*, 2021 WL 4892153 (4th Cir. 2021).  That decision was vacated by a vote of the full Court, and we now consider this appeal en banc.

II.

We review de novo the district court's summary judgment decision.  *Jessup v. Barnes Grp., Inc.*, 23 F.4th 360, 365 (4th Cir. 2022).  Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Id.* (quoting Fed. R. Civ. P. 56(a)).

A.

*EQUAL PROTECTION CLAIM*

We begin with the plaintiffs' Equal Protection claim.  To prevail on this claim under Section 1983, the plaintiffs were required to show that: (1) the defendants deprived them of a constitutional right; and (2) the defendants did so "under color of [State] statute,

12

ordinance, regulation, custom, or usage" (the state action requirement).[4]  *Mentavlos v. Anderson*, 249 F.3d 301, 310 (4th Cir. 2001) (alteration in original) (citation omitted).  The state action requirement of Section 1983 "excludes from its reach merely private conduct, no matter how discriminatory or wrongful."  *Id.* (citation and internal quotation marks omitted).

i.

*State Action Analysis*

In assessing a private actor's relationship with the state for purposes of an Equal Protection claim, we must determine whether there is a "sufficiently close nexus" between the defendant's challenged action and the state so that the challenged action "may be fairly treated as that of the State itself."  *Id.* at 314 (citation and internal quotation marks omitted).  "What is fairly attributable is a matter of normative judgment, and the criteria lack rigid simplicity. . . . [N]o one fact can function as a necessary condition across the board for finding state action."  *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001).

The Supreme Court has identified various circumstances in which a private actor may be found to have engaged in state action.  The Court has held that when the state has coerced, or has provided "significant encouragement" to, a private actor, or if there is

---

[4] We treat the under-color-of-state-law requirement for a Section 1983 claim consistent with the state action requirement of the Fourteenth Amendment.  *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982); *Goldstein v. Chestnut Ridge Volunteer Fire Co.*, 218 F.3d 337, 341 (4th Cir. 2000).

13

"pervasive entwinement of public institutions and public officials" with a private entity, that entity's conduct is considered state action. *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982); *Brentwood*, 531 U.S. at 298. Accordingly, a state's exercise of coercive power or compulsion is not a requirement for a finding of state action under Section 1983. *Brentwood*, 531 U.S. at 295.

A state also will be held responsible for a private actor's decision when the state's engagement or encouragement is so significant that "the choice must in law be deemed to be that of the State." *Rendell-Baker v. Kohn*, 457 U.S. 830, 842 (1982). Both the Supreme Court and this Court have recognized the presence of such engagement or encouragement when a state has outsourced or otherwise delegated certain of its duties to a private entity, thereby rendering the acts performed under those delegated obligations "under color of law." *Goldstein v. Chestnut Ridge Volunteer Fire Co.*, 218 F.3d 337, 342 (4th Cir. 2000); *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1929 n.1 (2019) ("[A] private entity may, under certain circumstances, be deemed a state actor when the government has outsourced one of its constitutional obligations to [that] private entity."); *West v. Atkins*, 487 U.S. 42, 56 (1988) (holding that a state's delegation of its duty to provide medical care to prisoners rendered a contract physician a state actor). When the function at issue has been "traditionally the *exclusive* prerogative" of the state, a private entity executing that function has engaged in state action. *Rendell-Baker*, 457 U.S. at 842 (citation omitted); *see Goldstein*, 218 F.3d at 349 (holding that volunteer fire company in Maryland was state actor because it performed essential governmental function traditionally and exclusively reserved to the state, received significant funding from state, was subject to extensive state

14

regulation, and was deemed by state to be state actor); *see also Manhattan Cmty. Access Corp.*, 139 S. Ct. at 1928-29.

The common foundation underlying these various and sometimes overlapping circumstances is that (1) there is no bright-line rule separating state action from private action, and that (2) the inquiry is highly fact-specific in nature. In other words, the state action analysis "lack[s] rigid simplicity" and, thus, a "range of circumstances" can support a finding of state action. *Brentwood*, 531 U.S. at 295, 303 (noting that "no one criterion must necessarily be applied" to establish state action); *Goldstein*, 218 F.3d at 343 (holding that no single factor standing alone establishes state action). We therefore consider the totality of the circumstances of the relationship between the private actor and the state to determine whether the action in question fairly is attributable to the state. *Goldstein*, 218 F.3d at 343.

ii.

*State Action Analysis—CDS*

In the present case, because the state of North Carolina was not involved in CDS' decision to implement the skirts requirement, there was no "coercion" or "pervasive entwinement" by the state with the challenged conduct. *Blum*, 457 U.S. at 1004; *Brentwood*, 531 U.S. at 298. The plaintiffs argue, however, that CDS nevertheless qualifies as a state actor on a separate permitted basis, namely, that the operation of schools designated as "public" under North Carolina law is an exclusively public function that North Carolina, by statute, has delegated in part to charter school operators to fulfill the

15

state's constitutional duty to provide free, universal elementary and secondary schooling. *See Rendell-Baker*, 457 U.S. at 842; *West*, 487 U.S. at 56.

In response, CDS contends that like the private school at issue in *Rendell-Baker*, 457 U.S. 830, operators of North Carolina charter schools merely are private entities fulfilling contracts with the state. According to CDS, because no North Carolina student is required to attend CDS, the state has not delegated to charter schools its responsibility to educate North Carolina students. CDS also relies on the fact that the Supreme Court never has held that the provision of elementary and secondary education is exclusively a state function. Thus, CDS asks us to conclude that it merely is a private actor providing a service under its charter contract with the state. We disagree with CDS' argument.

The North Carolina Constitution mandates that the state "provide by taxation and otherwise for a general and uniform system of free public schools . . . wherein equal opportunities shall be provided for all students." N.C. Const. art. IX, § 2, cl. 1. To fulfill this duty, in addition to establishing traditional public schools, the North Carolina legislature has authorized the creation of public charter schools that are overseen by a state board. N.C. Gen. Stat. § 115C-218; *see also* N.C. Const. art. IX, § 5 ("The State Board of Education shall supervise and administer the free public school system."). Charter schools may only operate under the authority granted to them by their charters with the state. *See Id.* §§ 115C-218.15(c), 115C-218.5.

Among other requirements, charter schools must design their educational programming to satisfy student performance standards adopted by the state board of education, a requirement not applicable to non-public schools. *Id.* §§ 115C-218.85(a)(2),

16

115C-547 through -562.  The state may revoke a school's charter, among other reasons, for non-compliance with the terms of the charter, poor student performance, or poor fiscal management.  *See id.* § 115C-218.95.  Enrollment at charter schools is open to any student eligible to attend a public school in North Carolina.  *Id.* § 115C-218.45.

> In defining the nature of charter schools, North Carolina law expressly provides:
>
> A charter school that is approved by the State *shall be a public school* within the local school administrative unit in which it is located.  All charter schools shall be accountable to the State Board for ensuring compliance with applicable laws and the provisions of their charters.

*Id.* § 115C-218.15(a)[5] (emphasis added); *see also id.* § 115C-218(c) (North Carolina Office of Charter Schools located within the Department of Public Instruction); *Sugar Creek Charter Sch., Inc. v. North Carolina*, 712 S.E.2d 730, 742 (N.C. Ct. App. 2011) (observing that charter schools are "indisputably public schools"); *Francine Delany New Sch. for Children, Inc. v. Asheville City Bd. of Educ.*, 563 S.E.2d 92, 97-98 (N.C. Ct. App. 2002) (holding that charter schools are subject to same state budget format as traditional public schools, because the legislature "clearly expressed its intent" that charter schools "be treated as public schools").  And "for purposes of providing certain State-funded employee benefits," the North Carolina legislature has specified that "charter schools are *public schools* and that the employees of charter schools are *public school employees*."  N.C. Gen.

---

[5] Citing this statutory provision and the North Carolina Constitution, CDS' charter reiterates that charter schools are public schools under state law.

Stat. § 115C-218.90(a)(4) (emphasis added). Thus, under the plain language of these statutes, as a matter of state law, charter schools in North Carolina are public institutions.[6]

Consistent with this "public" designation, charter schools in North Carolina receive a per-pupil funding allotment from the state board of education based on the amount provided for students attending traditional public schools. *Id.* § 115C-218.105(a). The local school administrative unit where each student resides similarly transfers the student's share of local funding to the charter school that the student attends. *Id.* § 115C-218.105(c). As a result of these and other public funding mechanisms, CDS receives 95% of its funding directly from public sources.[7] Such substantial public funding, while not determinative, is a factor that we weigh in determining state action. *Goldstein*, 218 F.3d at 347.

---

[6] The Supreme Court of North Carolina recently held that North Carolina charter schools are not state agencies entitled to sovereign immunity. *State ex rel. Stein v. Kinston Charter Acad.*, 866 S.E.2d 647, 650 (N.C. 2021). The court concluded that public charter schools are "local rather than statewide in character," and therefore cannot assert the immunity afforded to the state itself and to its agencies, but not to local government entities. *Id.* at 659. Thus, this holding recognizes that charter schools, like other public schools in North Carolina, are essentially local entities, as reflected in N.C. Gen. Stat. § 115C-218.15(a). As explained above, that provision states in part that "[a] charter school that is approved by the State shall be a public school *within the local school administrative unit* in which it is located." *Id.* (emphasis added). Accordingly, the court's holding that North Carolina charter schools are not state agencies is inapposite to our present analysis whether the challenged conduct of CDS, a non-profit corporation operating a North Carolina public school, constitutes state action.

[7] CDS also receives funding from the federal government pursuant to certain federal laws, including the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.*

18

The statutory framework of the North Carolina charter school system compels the conclusion that the state has delegated to charter school operators like CDS part of the state's constitutional duty to provide free, universal elementary and secondary education.[8] *See id.*, 218 F.3d at 342; *see also Manhattan Cmty. Access Corp.*, 139 S. Ct. at 1929 n.1 (citing *West*, 487 U.S. at 56); N.C. Const. art. IX, § 2, cl. 1; N.C. Gen. Stat. § 115C-1.  The state bears "an affirmative obligation" under the state constitution to educate North Carolina's students and partially has "delegated that function" to charter school operators, who have carried out the state's obligation by virtue of their charters with the state.  *West*, 487 U.S. at 56; *see also Brent v. Wayne Cnty. Dep't of Hum. Servs.*, 901 F.3d 656, 676-77 (6th Cir. 2018) (holding that private foster care agencies were state actors because "Michigan is constitutionally required to protect children who are wards of the state from the infliction of unnecessary harm" and "contracted with [the defendants] to fulfill [the state's] duties" (citation and internal quotation marks omitted)).  Thus, charter schools in North Carolina "exercise[] power possessed by virtue of state law and made possible only because the [school] is clothed with the authority of state law."  *West*, 487 U.S. at 49 (citation and internal quotation marks omitted).

---

[8] In implementing the state constitutional requirement to provide "a general and uniform system of free public schools," North Carolina guarantees students access to such education through high school, up to the age of 21.  *See* N.C. Const. art. IX, § 2, cl. 1; N.C. Gen. Stat. § 115C-1.

19

The Supreme Court has held that such a delegation of a state's responsibility renders a private entity a state actor. *See id.* at 56. In articulating the rationale for this rule, the Court explained that a state cannot delegate duties that "it is constitutionally obligated to provide and leave its citizens with no means for vindication of those [constitutional] rights." *See id*. at 56-57 & n.14 (citation omitted). So too, here. Were we to adopt CDS' position, North Carolina could outsource its educational obligation to charter school operators, and later ignore blatant, unconstitutional discrimination committed by those schools. We need look no further than the shameful history of state-sponsored racial discrimination in this country to reject an application of the Equal Protection Clause that would allow North Carolina to abdicate its duty to treat public schoolchildren equally. For the same reason, we will not assume that students' constitutional rights in these public schools will be protected merely because CDS' charter requires compliance with the federal and state constitutions. The right of Equal Protection under the Constitution inheres in the individual and is not dependent on the charter obligations of any North Carolina public school.

Next, the fact that students are not compelled to attend CDS and have the option of attending a traditional public school does not bear on the question whether CDS is a state actor. The ability of North Carolina's students to opt out of discriminatory treatment does not determine whether that treatment is attributable to the state. We look to the relationship between the charter school and the state to make this assessment. Otherwise, the state could be excused from engaging in discrimination because only some of its schools discriminate. *No* public school in North Carolina can violate the constitutional rights of its

students.  If a student wishes to attend a school with discriminatory policies, the student must select a private institution not subject to the constraints of the Constitution.

CDS, however, attempts to distance itself from North Carolina's designation of charter schools as public institutions by characterizing its role as providing "educational services" generally, a function that has been fulfilled historically by both private and public entities.  We disagree with CDS' use of this high level of generality.  *See Rendell-Baker*, 457 U.S. at 842 (defining the school's function as the education of "maladjusted high school students," not "education" broadly); *Manhattan Cmty. Access Corp.*, 139 S. Ct. at 1929 (characterizing the holding in *Rendell-Baker* as applying to "special education"); *Mentavlos*, 249 F.3d at 316 (rejecting contention that "military-type training of non-enlisted students" was a power "traditionally reserved exclusively to the government").  Instead, the proper inquiry requires a narrower lens, namely, identifying the "function within the state system" that CDS serves.  *West*, 487 U.S. at 55-56; *Rendell-Baker*, 457 U.S. at 838, 842.

Charter schools in North Carolina do not function merely as "an alternative method of primary education," akin to private schools and homeschooling. [9]  First Dissent Op. 70-72.  Characterizing the function of North Carolina charter schools in this manner ignores both the "free, universal" nature of this education and the statutory framework chosen by

---

[9] As noted by the National Alliance for Public Charter Schools in their brief in support of the *plaintiffs'* petition for rehearing en banc in this case, North Carolina's Division of Nonpublic Education supervises private and home schools, while the state's Department of Public Instruction provides oversight for charter schools.  *See* N.C. Gen. Stat. §§ 115C-548, 566(a), and 218(c).

North Carolina in establishing this type of public school. CDS operates a "public" school, under authority conferred by the North Carolina legislature and funded with public dollars, functioning as a component unit in furtherance of the state's constitutional obligation to provide free, universal elementary and secondary education to its residents. Accordingly, we hold that in operating a school that is part of the North Carolina public school system, CDS performs a function traditionally and exclusively reserved to the state. *Rendell-Baker*, 457 U.S. at 842.

Our conclusion is not affected by CDS' reliance on the Supreme Court's ultimate holding in *Rendell-Baker*, 457 U.S. 830. In evaluating whether a private entity's conduct amounts to state action, we "identify[] the specific conduct of which the plaintiff complains" to determine whether that conduct is "fairly attributable to the State." *Mentavlos*, 249 F.3d at 311 (citation and internal quotation marks omitted); *Brentwood*, 531 U.S. at 295. The challenged actions in *Rendell-Baker* involved certain personnel decisions at a private institution, matters clearly outside the purview of the state's regulation. 457 U.S. at 841-42.

In that decision, the Supreme Court explained that the private school's action in terminating the workers' employment was not attributable to the state for purposes of Section 1983, because "the education of maladjusted high school students" was not "traditionally the *exclusive* prerogative of the State." *Id.* at 834, 842-43 (citation omitted). The Court contrasted this narrow subset of education with "traditional public schools." *Id.* at 842. The Court thus explained that "the relevant question is not simply whether a private

22

group is serving a 'public function.'" *Id*. Rather, "the relevant question" is whether "the function performed has been 'traditionally the *exclusive* [function] of the State.'" *Id*.

Thus, in *Rendell-Baker*, although the school's provision of education to those special students served a "public function" because that function largely was funded through the school's contracts with state and local governments, the Court reasoned that the private school was "not fundamentally different from many private corporations whose business depends primarily on contracts" to build physical infrastructure for the government. *Id.* at 840-42. "Acts of such private contractors do not become acts of the government by reason of their significant or even total engagement in performing" contractual services for public entities. *Id.* at 840-41.

In material contrast to the personnel decisions at issue in *Rendell-Baker*, CDS implemented its dress code, including the skirts requirement, as a central component of the public school's *educational* philosophy, pedagogical priorities, and mission of providing a "traditional school with a traditional curriculum, traditional manners[,] and traditional respect." By CDS' own admission, the skirts requirement directly impacts the school's core educational function and, thus, directly impacts the constitutional responsibility that North Carolina has delegated to CDS.

In yet another telling distinction between the private school in *Rendell-Baker* and the public school at issue here, we observe that the school's contracts with the state in *Rendell-Baker* specified that the school's employees were not government employees. *Id.* at 833. Here, however, North Carolina law designates employees of charter schools as public employees eligible to receive certain state benefits, including state-employee health

23

and retirement plans. *See* N.C. Gen. Stat. § 115C-218.90(a)(4). The North Carolina legislature's action recognizing this special status of charter school employees and conferring eligibility for these substantial governmental benefits on them underscores the public function of charter schools within the state's public school system.

These are not incidental or formalistic distinctions. We are not aware of any case in which the Supreme Court has rejected a state's designation of an entity as a "public" school under the unambiguous language of state law and held that the operator of such a public school was not a state actor.[10] We are not prepared to do so here. As discussed

---

[10] The Supreme Court's decision in *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345 (1974), involving a public utility, provides a useful contrast to the point we make here. There, Pennsylvania had designated by statute "all companies engaged in providing gas, power, or water; all common carriers, pipeline companies, telephone and telegraph companies, sewage collection and disposal companies; and corporations affiliated with any company engaging in such activities" as "public utilit[ies]." *Id.* at 350 n.7. The Court nevertheless concluded that the defendant private power company was not a state actor, despite extensive state regulation and the company's state-granted monopoly status, concluding that the provision of utility services was neither a state function nor a municipal duty. *Id.* at 351-53. Thus, although the "primary object" of the law was "to serve the interests of the public," the "public utility" designation merely indicated that the utility would provide a service to the public. *Id.* at 351-53 & n.8.

Our conclusion also is not affected by the Supreme Court's decision in *Polk County v. Dodson*, 454 U.S. 312 (1981), in which the Court held that a public defender, employed by the state, does not act under color of state law for purposes of Section 1983 "when performing a lawyer's traditional functions as counsel to a defendant in a criminal proceeding." *Id.* at 325. The Court reasoned that a public defender, like any defense attorney in a criminal case, engages in functions adversarial to the state and has a relationship with his client that is "identical to that existing between any other lawyer and client." *Id.* at 318, 320. Here, however, there is no such "value at odds with finding public accountability" for CDS. *Brentwood*, 531 U.S. at 303-04 (citing *Polk*, 454 U.S. at 323, and explaining that "[t]he state action doctrine does not convert opponents into virtual agents").

24

above, the North Carolina Constitution mandates the creation of free and uniform public schools, and the state fulfilled that obligation in part by enacting legislation authorizing the charter school system. It was North Carolina's sovereign prerogative to determine whether to treat these state-created and state-funded entities as public. Rejecting the state's designation of such schools as public institutions would infringe on North Carolina's sovereign prerogative, undermining fundamental principles of federalism.

Our conclusion likewise is not altered by CDS' reliance on the decisions of our sister circuits in *Caviness v. Horizon Community Learning Center, Inc.*, 590 F.3d 806 (9th Cir. 2010), and *Logiodice v. Trustees of Maine Central Institute*, 296 F.3d 22 (1st Cir. 2002), which respectively held that certain schools were not state actors for purposes of personnel and student discipline decisions.[11] In the context of state-funded education, our totality-of-the-circumstances inquiry is guided not only by the factual circumstances of a plaintiff's claim, but also by the laws of the state regulating the school in question. We therefore do not read the decisions of our sister circuits as establishing bright-line rules applicable to every case, but instead as evaluating the specific conduct challenged by the plaintiffs in the

---

[11] We also are unpersuaded by the first dissent's reliance on *Robert S. v. Stetson Sch., Inc.*, 256 F.3d 159 (3d Cir. 2001). First Dissent Op. 67-68. The school at issue was a private school providing education to juvenile sex offenders that was not obligated to accept any particular student or students. *Robert S.*, 256 F.3d at 162-63. The plaintiff had alleged that the school's staff had subjected him to physical and psychological abuse. *Id.* at 163. The Third Circuit found that the private school was not engaged in state action, relying primarily on the failure of the evidence to show that the school performed a function traditionally and exclusively reserved to the state, especially when the only schools offering similar services were also private schools. *Id.* at 166. This fact pattern does not bear any resemblance to the facts before us.

25

context of the governing state law. Here, the plaintiffs challenge a dress code provision that is central to the educational philosophy of a charter school deemed public under North Carolina law and funded accordingly. Thus, the Ninth Circuit's state-action analysis, involving Arizona law and a charter school's personnel decision, and the First Circuit's state-action analysis, involving Maine law and an issue of student discipline in a private school performing a state contract, do not impact our analysis here. *See Caviness*, 590 F.3d at 808; *Logiodice*, 296 F.3d at 24.

Ultimately, the state action inquiry in this case is not complicated: (1) North Carolina is required under its constitution to provide free, universal elementary and secondary schooling to the state's residents; (2) North Carolina has fulfilled this duty in part by creating and funding the public charter school system; and (3) North Carolina has exercised its sovereign prerogative to treat these state-created and state-funded schools as public institutions that perform the traditionally exclusive government function of operating the state's public schools. Accordingly, the public-school operator at issue here, CDS, implemented the skirts requirement as part of the school's educational mission, exercising the "power possessed by virtue of state law and made possible only because the [school] is clothed with the authority of state law." *West*, 487 U.S. at 49 (citation and internal quotation marks omitted). Under these circumstances, we will not permit North Carolina to delegate its educational responsibility to a charter school operator that is insulated from the constitutional accountability borne by other North Carolina public schools.

26

Contrary to our dissenting colleagues' views, nothing in our holding will stifle innovation in education provided by North Carolina's public charter schools. Innovative programs in North Carolina's public schools can and should continue to flourish, but not at the expense of constitutional protections for students.

The second dissent, however, in a non-sequitur that is both baffling and disturbing, suggests that historically black colleges and universities (HBCUs) will be imperiled if CDS is held to be a state actor. But the second dissent never explains its position, likely because it cannot. HBCUs that are public institutions have never been shielded from constitutional accountability. They have flourished because of the talent and hard work of their teachers and students. And these HBCUs have not been given the type of preferential treatment that all the dissenters would give CDS today.

Also, while purportedly addressing the state actor issue, the second dissent launches an attack on the merits of the case by lamenting the demise of chivalry in our society. In fact, the second dissent promotes chivalry during the age of knighthood as a model for CDS. Some scholars, however, paint a far grimmer picture of that age, describing it as a time when men could assault their spouses and commit other violent crimes against them with impunity. *See* Steven F. Shatz & Naomi R. Shatz, Chivalry Is Not Dead: Murder, Gender, and the Death Penalty*, 27 Berkeley J. Gender L & Just. 64, 68-69 (2012) (citations omitted) ("[T]he 'Age of Chivalry' was a hard time for victims of domestic violence, when physically 'chastising' one's wife was considered an honorable knight's duty. . . . [T]he chivalrous knight [] was entitled to employ physical violence against his

27

wife."). So, contrary to the second dissent's view, chivalry may not have been a bed of roses for those forced to lie in it.

But there is much more for concern. The logical consequence of both dissents, and as freely acknowledged by CDS at oral argument in this case, is that innovation without accountability under the Equal Protection Clause could result in an African American student, another minority student, or a female student being excluded from full participation in North Carolina's charter schools with no recourse other than seeking to have the school's charter enforced or revoked. And how do a student and her parents go about that process? How many will just give up rather than having to confront the school system and to finance such a challenge?

The response of both dissents apparently is that these students should just move on to a different public school that values constitutional rights more than "innovative" exclusionary measures. That is no answer. Rather, the plain and obvious answer to the problem is to ensure that operators of public charter schools in North Carolina are not insulated from the constitutional accountability borne by the state's other public schools.[12] Courts may not subjugate the constitutional rights of these public-school children to the

---

[12] Contrary to our first dissenting colleague's attempt to sound the alarm that our decision will have a far-reaching impact on charter schools nationwide, First Dissent Op. 82, our analysis and conclusion narrowly focus on the statutory framework and language chosen by North Carolina's legislature in establishing North Carolina's charter schools, and on the conduct at issue affecting the state's core educational function.

28

facade of school choice. Accordingly, we hold that the plaintiffs have established that CDS acted under color of state law for purposes of Section 1983.

iii.

*State Action Analysis—RBA*

We reach a different conclusion with respect to RBA, the for-profit management contractor of CDS. The plaintiffs assert that RBA's "intertwinement with CDS," its role in daily school operations, and its responsibility for enforcing the skirts requirement renders RBA a state actor. According to the plaintiffs, RBA and CDS are essentially indistinguishable entities and, thus, both qualify as state actors. Despite the close relationship between CDS and RBA, we disagree with the plaintiffs' argument.

There are several key differences between RBA, a for-profit management company, and CDS, the non-profit charter school operator authorized by the state to run a charter school. North Carolina has not chosen to delegate its constitutional duty to provide free, universal elementary and secondary education to for-profit management companies like RBA. To the contrary, RBA has no direct relationship with the state and is not a party to the charter agreement between CDS and North Carolina. Instead, RBA manages the daily functioning of the school under its management agreement with CDS. In working for CDS, rather than for the state of North Carolina, RBA's actions are more attenuated from the state than those of CDS, the entity authorized by the state to operate one of its public schools. We therefore conclude that RBA's actions implementing the skirts requirement are not "fairly attributable" to the state. *Brentwood*, 531 U.S. at 295.

iv.

29

*Merits of Equal Protection Claim Against CDS*

Having determined that CDS is a state actor for purposes of Section 1983, we turn to consider the merits of the plaintiffs' Equal Protection claim involving CDS. The plaintiffs assert that the skirts requirement fails the rigors of heightened scrutiny, because CDS has not identified an important governmental interest that justifies the sex-based classification. The plaintiffs contend that, instead, CDS merely has relied on gender stereotypes to support the skirts requirement, a plainly illegitimate justification under well-settled Supreme Court precedent.

In response, CDS argues that "comprehensive sex-specific dress codes" do not violate the Equal Protection Clause when male and female students are subject to comparable burdens under the policy. Thus, according to CDS, the skirts requirement does not violate the Constitution because boys also are limited in dressing and grooming options, including being subject to prohibitions on long hair and wearing jewelry, which are applicable only to male students. CDS further asserts that because its female students have achieved academic and extracurricular success, these students have not been "hobbled" by the skirts requirement. We disagree with CDS' arguments.

For many years, the Supreme Court and this Court have applied a heightened level of scrutiny to sex-based classifications like the skirts requirement. *United States v. Virginia*, 518 U.S. 515, 532-33 (1996); *see also Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1689-90 (2017); *Knussman v. Maryland*, 272 F.3d 625, 635 (4th Cir. 2001); *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 608 (4th Cir. 2020). These decisions have been grounded on the Supreme Court's landmark decision in *Virginia*. There, the Supreme

30

Court reviewed the Commonwealth of Virginia's attempt to preserve single-sex education for males at the Virginia Military Institute (VMI) by establishing a "leadership" program for women at a nearby private, women's college. *Virginia*, 518 U.S. at 519-20, 526. The Court rejected Virginia's attempt to remedy its discriminatory treatment of women in this manner. *Id.* at 534.

In conducting its analysis, the Court emphasized that parties seeking to defend a state actor's sex-based classification "must demonstrate an exceedingly persuasive justification for that action." *Id.* at 531 (citation and internal quotation marks omitted). This "burden of justification" is a "demanding" one, and "rests entirely on the State." *Id.* at 533. The Court explained that the demanding review of intermediate scrutiny is required because of our nation's "volumes of history" demonstrating the denial of rights and opportunities to women because of their sex. *Id.* at 531. Accordingly, to satisfy such heightened scrutiny, a defendant "must show at least that the challenged classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Id.* at 533 (alterations, citation, and internal quotation marks omitted).

We approach sex-based classifications with skepticism because of the dangers enmeshed in such arbitrary sorting of people. As we have explained:

> [J]ustifications for gender-based distinctions that are rooted in overbroad generalizations about the different talents, capacities, or preferences of males and females will not suffice. Legislative classifications which distribute benefits and burdens on the basis of gender carry the inherent risk of reinforcing stereotypes about the 'proper place' of women and their need for special protection.

31

*Knussman*, 272 F.3d at 635-36 (citations and internal quotation marks omitted).  In other words, we will reject sex-based classifications that "appear to rest on nothing more than conventional notions about the proper station in society for males and females."  *Id.* at 636; *see also Virginia*, 518 U.S. at 550 (rejecting defendant's reliance on "generalizations about 'the way women are'" to justify differential treatment); *Sessions*, 137 S. Ct. at 1692 (explaining that when the government's "objective is to exclude or 'protect' members of one gender in reliance on fixed notions concerning that gender's roles and abilities, the objective itself is illegitimate" (citation, quotation marks, and alteration omitted)).

In view of this precedent, we reject CDS' argument that the skirts requirement satisfies intermediate scrutiny because the dress code as a whole is intended to "help to instill discipline and keep order."  Instead, we must evaluate whether there is an exceedingly persuasive justification for the *sex-based classification being challenged*, namely, the skirts requirement.  CDS cannot justify the skirts requirement based on the allegedly "comparable burdens" imposed by other portions of the dress code that are applicable only to male students.  A state actor's imposition of gender-based restrictions on one sex is not a defense to that actor's gender-based discrimination against another sex.[13]

---

[13] To the extent that other courts have endorsed a "comparable burdens" test for sex-specific dress codes, we respectfully disagree with that view.  *See Hayden v. Greensburg Comm. Sch. Corp.*, 743 F.3d 569, 577-82 (7th Cir. 2014) (in dicta, collecting cases and discussing principles of the comparable burdens test); *cf. Jespersen v. Harrah's Operating Co.*, 444 F.3d 1104, 1109-10 (9th Cir. 2006) (en banc) (employing such a test in the Title VII context without considering the Equal Protection Clause).  These cases rely heavily on precedent from the 1970s affirming the validity of dress codes based on "traditional" (Continued)

32

We also observe at the outset that the agreement of some parents to the sex-based classification of the skirts requirement is irrelevant to our Equal Protection analysis. No parent can nullify the constitutional rights of other parents' children.

Applying the demanding lens of intermediate scrutiny, we conclude that the skirts requirement is not supported by any important governmental objective and, thus, falls woefully short of satisfying this constitutional test. CDS does not attempt to disguise the true, and improper, rationale behind its differential treatment of girls, which plainly does not serve an important governmental interest. In his initial response to a parent's objection to the requirement, Baker Mitchell, the founder of CDS, explained that the skirts requirement embodies "traditional values." According to Mitchell, the requirement for girls to wear skirts was part of CDS' effort "to preserve chivalry and respect among young women and men," which also included requiring boys "to hold the door open for the young ladies and to carry an umbrella" to keep rain from falling on the girls. Mitchell later elaborated that chivalry is "a code of conduct where women are . . . regarded as a fragile vessel that men are supposed to take care of and honor." Mitchell explained that in implementing the skirts requirement, CDS sought to "treat [girls] courteously and more gently than boys." CDS' Board members agreed with these stated objectives, including CDS' goal of fostering "traditional roles" for boys and girls.

---

notions of appropriate gender norms. As explained above, any sex-specific dress or grooming policy, like any other sex-based classification, must be substantially related to an important governmental objective. *Virginia*, 518 U.S. at 533. Thus, applying the holding in *Virginia*, we do not compare the relative "burdens" that CDS' dress code places on its female and male students.

It is difficult to imagine a clearer example of a rationale based on impermissible gender stereotypes. On their face, the justifications proffered by CDS "rest on nothing more than conventional notions about the proper station in society for males and females." *Knussman*, 272 F.3d at 636; *see also Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 725 (1982) (a sex-based classification reflecting "archaic and stereotypic notions . . . is illegitimate"); *J.E.B. v. Alabama*, 511 U.S. 127, 138 (1994) (rejecting "the very stereotype the law condemns" as a justification for a state's sex-based policy (citation omitted)). Under long-standing precedent of the Supreme Court and this Circuit, the sex-based stereotypes advanced by CDS utterly fail to supply the "exceedingly persuasive justification" necessary for the skirts requirement to survive constitutional scrutiny.[14] *Virginia*, 518 U.S. at 531; *Sessions*, 137 S. Ct. at 1698; *Grimm*, 972 F.3d at 608. Thus, in the absence of any important governmental objective supporting CDS' skirts requirement, we hold that the skirts requirement fails intermediate scrutiny and facially violates the Equal Protection Clause.

In reaching this conclusion, we observe that nothing in the Equal Protection Clause prevents public schools from teaching universal values of respect and kindness. But those values are never advanced by the discriminatory treatment of girls in a public school. Here,

---

[14] Because we conclude that CDS has not satisfied its burden to establish an "exceedingly persuasive" justification for the skirts requirement, we do not address whether the policy is "substantially related" to an important governmental objective. *Virginia*, 518 U.S. at 533. For the same reason, we need not consider the ample evidence of the harm the plaintiffs suffered due to the skirts requirement and the pernicious gender stereotypes that the dress code communicated to CDS' students.

34

the skirts requirement blatantly perpetuates harmful gender stereotypes as part of the public education provided to North Carolina's young residents. CDS has imposed the skirts requirement with the express purpose of telegraphing to children that girls are "fragile," require protection by boys, and warrant different treatment than male students, stereotypes with potentially devastating consequences for young girls. If CDS wishes to continue engaging in this discriminatory practice, CDS must do so as a private school without the sanction of the state or this Court.

## B.

### *TITLE IX CLAIM*

We next consider the plaintiffs' cross-appeal of the district court's summary judgment award on the Title IX claim in favor of the defendants. The plaintiffs allege that when the defendants imposed the skirts requirement, they violated Title IX by excluding the plaintiffs from participation in CDS activities, denying them the full benefit of their education and subjecting them to discrimination because of their sex. *See* 20 U.S.C. § 1681(a). According to the plaintiffs, the district court erred in holding that Title IX categorically does not apply to sex-based dress codes because the United States Department of Education (Department) rescinded an earlier regulation governing such policies. In the plaintiffs' view, the unambiguous language of Title IX prohibiting discrimination based on sex encompasses sex-based dress codes and, thus, no deference should be given to the Department's regulatory decision.

In response, the defendants contend that because Title IX does not explicitly reference dress codes, we should defer to the Department's "authoritative interpretation"

35

of the statute. In the defendants' view, the Department's decision to rescind the regulation addressing dress codes manifested the agency's reasonable assessment that such a regulation is not authorized under the statute. Separately, RBA also argues that it is not a recipient of federal funds and, thus, is not subject to Title IX. We disagree with the defendants' arguments.

i.

*Title IX Claim—RBA*

Before addressing Title IX's applicability to sex-based dress codes, we begin with the preliminary question whether RBA is subject to the requirements of the statute. According to RBA, it does not qualify as a recipient of federal funds within the meaning of Title IX, because RBA benefits from such funds only by virtue of its contract with CDS and does not receive funding directly from the federal government. We find no merit in this argument.

Title IX applies to education programs and activities "receiving [f]ederal financial assistance," subject to enumerated exceptions. 20 U.S.C. § 1681(a). The accompanying regulation defines a "recipient" of federal funds to include, in relevant part:

> any public or private agency, institution, or organization, or other entity, or any person, to whom *[f]ederal financial assistance is extended directly or through another recipient* and which operates an education program or activity which receives such assistance, including any subunit, successor, assignee, or transferee thereof.

36

34 C.F.R. § 106.2(i) (emphasis added).[15]  The Supreme Court has clarified that "[e]ntities that receive federal assistance, whether directly *or through an intermediary*, are recipients within the meaning of Title IX."  *NCAA v. Smith*, 525 U.S. 459, 468 (1999) (emphasis added).

In the present case, it is undisputed that RBA receives 90% of its funding from the four schools operated by CDS, Inc., which in turn receive nearly all their funding from public sources, including the federal government.  RBA concedes that CDS uses its federal funding "in part to compensate RBA for services rendered under" the management agreement between CDS and RBA.  Under these facts and circumstances, we easily conclude that RBA receives financial assistance "through an intermediary."  *NCAA*, 525 U.S. at 468.  We therefore hold that RBA, as a recipient of federal funds through an intermediary, is subject to the requirements of Title IX.  *See* 20 U.S.C. § 1681(a); 34 C.F.R. § 106.2(i).

ii.

*Merits of Title IX Claim Against CDS and RBA*

We turn to consider the merits of the defendants' contention that Title IX does not apply to dress codes.  The defendants assert that because Title IX does not specifically reference dress codes, the statute's broad prohibition against sex discrimination in

---

[15] RBA does not dispute that it "operates an education program or activity" by managing the daily operations of CDS.  34 C.F.R. § 106.2(i).  And neither CDS nor RBA challenges the definition of "recipient" included in the Code of Federal Regulations, *see id.*

education is ambiguous. The defendants thus urge us to defer to the Department's decision to withdraw its prior regulation that had prohibited discrimination "against any person in the application of any rules of appearance."[16] Seven years after promulgating the regulation, the Department revoked it because, among other reasons, "[d]evelopment and enforcement of appearance codes is an issue for local determination."[17] However, as explained below, because we conclude that Title IX unambiguously applies to sex-based dress codes, we do not reach the question whether a department's rescission of its prior regulation would be entitled to deference.

In evaluating whether Title IX is applicable to sex-based dress codes, we use traditional tools of statutory construction to "determine whether Congress addressed the precise question at issue." *Nat'l Elec. Mfrs. Ass'n v. U.S. Dep't of Energy*, 654 F.3d 496, 504 (4th Cir. 2011) (citation and internal quotation marks omitted). Our inquiry begins with the text and the structure of the statute. *Id.* "If the intent of Congress is clear, that is the end of the matter; for the court . . . must give effect to the unambiguously expressed intent of Congress." *Chevron, Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984); *see also Pereira v. Sessions*, 138 S. Ct. 2105, 2113 (2018) (explaining that deference to agency interpretation not warranted when "Congress has supplied a clear and

---

[16] Nondiscrimination on the Basis of Sex in Education Programs and Activities Receiving or Benefiting from Federal Financial Assistance, 40 Fed. Reg. 24,141 (June 4, 1975).

[17] Nondiscrimination on the Basis of Sex in Education Programs and Activities Receiving or Benefiting from Federal Financial Assistance, 47 Fed. Reg. 32,526 (July 28, 1982).

unambiguous answer to the interpretive question at hand"). However, if the statute is vague or ambiguous, we will defer to the agency's reasonable interpretation of a statute it administers, a practice known as "*Chevron* deference." *Amaya v. Rosen*, 986 F.3d 424, 429 (4th Cir. 2021); *Chevron*, 467 U.S. at 843.

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The statute enumerates several types of entities and activities that are excepted from this broad prohibition. *See id.* §§ 1681(a)(1)-(9), 1686. Among other examples, certain religious organizations are exempted from Title IX's mandate, as are sororities, fraternities, and scouting organizations. *Id.* § 1681(a)(3), (6). Exempted activities also include "separate living facilities for the different sexes," *id.* § 1686, as well as single-sex "beauty pageants" and "father-son" and "mother-daughter" activities when offered to members of both sexes, *id.* § 1681(a)(8), (9). Notably, dress, appearance, and grooming policies are not included among the listed exceptions to Title IX.

Based on the plain language and structure of the statute, we conclude that Title IX unambiguously encompasses sex-based dress codes promulgated by covered entities. "Title IX is a broadly written general prohibition on discrimination, followed by specific, narrow exceptions to that broad prohibition." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005). In selecting this format, "Congress did not list *any* specific discriminatory practices" and, thus, Congress' failure to prohibit explicitly sex-based dress codes does not suggest that such policies are beyond the reach of the statute. *Id.*

39

Instead, we view Congress' decision to include specific exceptions in Title IX as a deliberate choice to "limit[] the statute to the [exceptions] set forth." [18] *United States v. Johnson*, 529 U.S. 53, 58 (2000) (interpreting 18 U.S.C. § 3624(e)); *see also Hillman v. Maretta*, 569 U.S. 483, 496 (2013) (interpreting 5 U.S.C. § 8705(e)). In doing so, Congress clearly articulated its intent regarding what conduct falls outside the statute's scope. If Congress had intended to exclude sex-based dress codes from the broad reach of Title IX, Congress would have designated such policies along with the other enumerated exceptions. But, as noted above, dress codes are not included in the exceptions listed in the statute. We thus hold that Congress intended that sex-specific dress codes imposed by covered entities be subject to the general prohibition against discrimination in Title IX.

Because we conclude that the statute unambiguously covers such sex-based dress codes, we do not defer to the Department's rescission of its regulation applicable to such policies. As the Supreme Court repeatedly has explained, "*Chevron* deference does not

---

[18] Our colleagues in the second dissent ignore this cardinal principle of statutory interpretation to achieve their desired result that the statute is ambiguous. Instead, they rely on the absence of a regulation by the Department regarding Title IX's application to dress codes. Second Dissent Op. 97-98. However, the plain language of Title IX compels the defendants to comply with its terms. Likewise, this plain statutory language bars the defense advanced in the first instance by this dissenting opinion, namely, that the defendants were somehow unaware of their obligation to provide equal educational programs and activities to students regardless of their sex.

apply [when] the statute is clear."[19] *Johnson v. Guzman Chavez*, 141 S. Ct. 2271, 2291 n.9 (2021); *see also Pereira*, 138 S. Ct. at 2113. For these reasons, we conclude that the district court erred in granting summary judgment to the defendants on the ground that the Department's decision to rescind its prior regulation is entitled to *Chevron* deference.[20]

iii.

*Title IX Standard*

Finally, we briefly address the standard that the district court should apply to the plaintiffs' Title IX claim on remand. As discussed above, Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Thus, for the plaintiffs to prevail under Title IX, they must show that: (1) they were excluded from participation in an education program or activity, denied the benefits of this education, or otherwise subjected to discrimination because of their sex; and (2) the challenged action caused them harm, which may include "emotional and dignitary harm."[21] *Grimm*, 972 F.3d

---

[19] We therefore need not address the plaintiffs' argument that the Department's decision to revoke the regulation is due no deference, because that act of rescission does not interpret the meaning of the statute or carry the force of law.

[20] Nothing about our decision today permits the federal government to "prescribe student dress codes." Second Dissent Op. 100–02. Our holding merely permits the district court on remand to consider in the first instance whether this North Carolina public school's sex-based dress code violates Title IX.

[21] As noted previously, the plaintiffs also must establish that the defendants are recipients of federal funding. 20 U.S.C. § 1681(a); *Grimm*, 972 F.3d at 616.

41

at 616, 618; 20 U.S.C. § 1681(a). In this context, the term "discrimination" "means treating [an] individual worse than others who are similarly situated." *Grimm*, 972 F.3d at 616 (citation, alteration, and internal quotation marks omitted).

As with their Equal Protection claim, the defendants urge that a "comparable burdens" test should be applied to the Title IX claim, by comparing the burdens inflicted by the dress code on female students as a group compared with male students. We disagree. Title IX protects the rights of "individuals, not groups," and does not ask whether the challenged policy "treat[s] women generally less favorably than . . . men."[22] *Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731, 1740 (2020). The Supreme Court has emphasized this distinction in the employment context:

> Suppose an employer fires a woman for refusing his sexual advances. It's no defense for the employer to note that, while he treated that individual woman worse than he would have treated a man, he gives preferential treatment to female employees overall. The employer is liable for treating *this* woman worse in part because of her sex. Nor is it a defense for an employer to say it discriminates against both men and women because of sex. [Title VII] works to protect individuals of both sexes from discrimination, and does so equally.

*Id.* at 1741. Discriminating against members of both sexes does not eliminate liability, but "doubles it." *Id.*

---

[22] Although the Supreme Court in *Bostock* addressed Title VII rather than Title IX, we have used precedent interpreting the antidiscrimination provisions of Title VII in our analysis of comparable provisions in Title IX. *See Grimm*, 972 F.3d at 616; *Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007) (en banc). Title VII's protections apply to any "individual," and Title IX similarly applies to any "person." *Compare* 42 U.S.C. § 2000e-2(a)(1), *with* 20 U.S.C. § 1681(a). Thus, both statutes focus on "individuals, not groups." *Bostock*, 140 S. Ct. at 1740-41.

The same reasoning applies here. Certain sex-based provisions of CDS' dress code may well violate the rights of both male and female students. However, the question that the district court must answer is not whether girls are treated less favorably than boys under the terms of the dress code. *See id.* at 1740. Instead, the court must determine whether the skirts requirement, the only challenged provision in this case, operates to exclude the plaintiffs from participation in their education, to deny them its benefits, or otherwise to discriminate against them based on their sex.[23] 20 U.S.C. § 1681(a); *see also Grimm*, 972 F.3d at 616; *Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230, 236 (4th Cir. 2021). For purposes of a claim of discrimination under Title IX, the plaintiffs are treated "worse" than similarly situated male students if the plaintiffs are harmed by the requirement that only girls must wear skirts, when boys may wear shorts or pants. Because the district court has not considered this question, we remand the Title IX claim for the district court to evaluate the merits of that claim in the first instance.

## III.

In sum, we hold that CDS, a public school under North Carolina law, is a state actor for purposes of Section 1983 and the Equal Protection Clause. By implementing the skirts requirement based on blatant gender stereotypes about the "proper place" for girls and

---

[23] The second dissent suggests that we are concluding that the skirts requirement is discriminatory under Title IX. Second Dissent Op. 97-98. This is inaccurate. Instead, our decision requires a remand for an evidentiary hearing applying the principles we announce today.

43

women in society, CDS has acted in clear violation of the Equal Protection Clause. We further hold that sex-based dress codes like the skirts requirement, when imposed by covered entities, are subject to review under the anti-discrimination provisions of Title IX. We therefore affirm the district court's award of summary judgment to the plaintiffs on their Equal Protection claim against CDS and affirm the court's award of summary judgment to RBA on that claim. We vacate the district court's judgment on the Title IX claim and remand for an evidentiary hearing on that claim asserted against all defendants.

*AFFIRMED IN PART,*
*VACATED IN PART,*
*AND REMANDED*

WYNN, Circuit Judge, with whom Judge MOTZ, Judge THACKER, Judge HARRIS, and Senior Judge KEENAN join, concurring:

This case presents a simple question: is Charter Day School a state actor for the purposes of the Fourteenth Amendment? According to legal principles (and common sense), the answer is an unequivocal "yes." So, I fully concur in the well-reasoned majority opinion.

Yet, our good colleague Judge Wilkinson disagrees and pens a separate opinion (the second dissent). But instead of offering concrete legal or factual arguments, the second dissent time travels back to the Middle Ages, dons knightly armor, and throws down the challenge gauntlet, presenting two broad policy arguments for why finding state action here is a bad idea.[1]

First, the second dissent predicts a parade of horribles will follow in the wake of the majority's decision, including "collateral damage" to institutions like historically Black colleges and universities. Second Dissent at 89. Second, the second dissent claims that the majority opinion's holding will curtail "student and parental choice" by subjecting charter

---

[1] To be sure, the second dissent dresses its policy arguments in legal trappings by invoking vague notions of "due process" and repeatedly citing nonbinding Supreme Court concurrences. *See* Second Dissent at 89–92 (citing such concurrences five times). But the thrust of the opinion boils down to a policy argument: the "state action doctrine must not be warped to extinguish the vibrancy provided by school choice." *Id.* at 92. And "even the most sensible policy argument [does] not empower us to ignore . . . the demands of the Constitution." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2441 (2019) (Gorsuch, J., concurring); *Chevron, U.S.A. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 864 (1984) ("[P]olicy arguments are more properly addressed to legislators or administrators, not to judges.").

schools "to the slow strangulation of litigation." *Id.* at 88, 103. Both arguments are profoundly flawed.

I.

The second dissent's first policy argument is a familiar one. Namely, if we find state action in this case, a parade of horribles will follow, and we will begin sliding down the slippery slope to "social homogenization" and "mandat[ed] uniformity." *Id.* at 85, 94.

As an example, the second dissent posits that the majority opinion—an opinion on gender discrimination in charter schools—will effectively "extinguish the place of historically [B]lack colleges and universities (HBCUs) in the educational system." *Id.* at 89. The apparent premise of the second dissent's argument is that HBCUs—and HBCUs alone—are engaging in unconstitutional racial discrimination, making them vulnerable to what the second dissent characterizes as the majority's "throw the baby out with the bath water" approach to righting constitutional wrongs.[2] *Id.* at 90.

But HBCUs are not segregated schools—like other modern higher-educational institutions, they are open to students of all races. Their notable attribute, of course, is that they are *historically* Black; just as other higher-educational institutions are *historically*

---

[2] Despite what the second dissent may say, it is hard to see how today's majority opinion can have *any* impact on HBCUs. In North Carolina, five of the State's ten HBCUs are private institutions, which makes them largely immune to the sorts of constitutional challenges the dissent bemoans. *Historically Black Colleges & Universities: Federal and State Policy Scan Brief*, The Hunt Institute (2021), https://hunt-institute.org/wp-content/uploads/2021/11/HI-NC10-IB-112021.pdf (saved as ECF opinion attachment 1). The other five are undeniably public schools, and therefore already subject to constitutional scrutiny. *Id.* That means the majority opinion's state-action analysis would not make one whit of difference when it comes to HBCUs.

46

white (HWCUs). Thus, while the second dissent is correct that "HBCUs were *first* developed to educate and nurture many of the brightest [Black] students in a state who, without the efforts of historically [B]lack institutions, would have been left with nowhere to go," it is equally true that "[HWCUs] were *first* developed to educate and nurture many of the brightest [white] students in a state who, without the efforts of historically [white] institutions, would have been left with nowhere to go." *Id.* at 89 (emphasis added).

But the mere fact an institution is *historically* Black or *historically* white does not mean that school is *currently engaging in racial discrimination*. After all, just as HWCUs no longer exclusively cater to white students, so too do HBCUs no longer exclusively cater to Black students. *See United States v. Fordice*, 505 U.S. 717, 743 (1992) (repudiating the notion that HBCUs may persist as "exclusively [B]lack enclaves by private choice" nearly thirty years ago).[3] In fact, in 2020, "non-Black students made up 24 percent of enrollment at HBCUs, compared with 15 percent in 1976." *Fast Facts: Historically Black Colleges and Universities*, National Center for Education Statistics, https://nces.ed.gov/fastfacts/display.asp?id=667 (last visited May 27, 2022) (saved as ECF opinion attachment 2).

---

[3] The Higher Education Act of 1965, as amended, defines an HBCU as "any historically Black college or university that was established prior to 1964, whose principal mission was, and is, the education of Black Americans, and that is accredited by a nationally recognized accrediting agency or association determined by the Secretary [of Education] to be a reliable authority as to the quality of training offered or is, according to such an agency or association, making reasonable progress toward accreditation." 20 U.S.C. § 1061(2). But to be sure, the designation is based on *historical* laws, not modern-day laws because today, HBCUs offer *all* students, regardless of race, an opportunity to develop their skills and talents.

47

Given these changed circumstances, it is puzzling why the second dissent assumes that HBCUs must still be benefitting from unconstitutional racial discrimination.[4] It is equally puzzling why it presumes that HWCUs are not engaging in similarly unconstitutional discrimination. Its decision to single out the former but not the latter as likely constitutional miscreants is ill-informed.[5]

## II.

The second dissent's second policy argument—which is really just a riff on the first—presents a classic false dichotomy. It first posits that *declining* to find state action here will protect charter schools from scurrilous lawsuits, thereby promoting "student and parental choice," "independence," "competition," "use of different and innovative teaching

---

[4] In response to the points raised by this concurrence, the second dissent now acknowledges that HBCUs are open to "all races and ethnicities" and "were in no way discriminatory." Second Dissent at 89–90. But, if the second dissent believes HBCUs are not discriminatory, then there is no legal or rational argument connecting the majority opinion to HBCUs. That means HBCUs have nothing to fear from today's majority opinion. So, why even mention HBCUs in this matter? After all, this case is about discriminating against girls at a charter school, not HBCUs.

[5] The second dissent's proofless prognosticating does not stop with HBCUs, however. It also predicts that "single-sex charter schools," schools "serving underserved and dispossessed populations," and "charter schools offering a progressive culture and curriculum" will be the next victims of the majority's "lamentable" efforts to impose "conformity" on state public-school systems. Second Dissent at 85, 95. However, the second dissent never explains why these policies make these institutions vulnerable to constitutional challenge, whether any hypothetical challenges are imminent, and whether these schools are likely to survive these imaginary lawsuits. Even if it had, I fail to see how a hypothetical lawsuit preventing schools from engaging in unconstitutional discrimination is "really all that horrible." *Wash. State Dep't of Licensing v. Cougar Den, Inc.*, 139 S. Ct. 1000, 1020 (2019) (Gorsuch, J., concurring). Nor do I understand how these purportedly terrible consequences can stay our hand. If an application of law to fact here compels us to find that Charter Day is a state actor—and it does—then we must so hold.

48

methods," "diverse program[ming]," and ultimately "educational progress." Second Dissent at 84, 88, 93–95. *Finding* state action, on the other hand, will make "innovative" schools like Charter Day "more vulnerable to [legal] attack," which will inevitably "extinguish the vibrancy provided by school choice" and "send[] education in a monolithic direction" where "social homogenization," "conformity," "insularity," "uniformity," and educational "calcification" reign supreme. *Id.* at 85–86, 92–95.

Stripped of its euphemisms, the second dissent's argument seems to be that subjecting schools like Charter Day to the demands of the Constitution will frustrate parents' imaginary prerogative[6] to send their children to free, state-funded public schools practicing unconstitutional discrimination, thereby "stifling" educational progress. *Id.* at 93. The premise underlying this argument is that state schools must be allowed *to experiment with unconstitutional discrimination* to honor "consumer[]" demand and achieve said "educational progress." *Id.* at 93–94.

That premise is so plainly wrong it borders on the offensive. Must state-designated public schools like Charter Day be allowed to experiment with blatantly unconstitutional gender discrimination to satisfy "consumer[]" demand? Must public schools be allowed to

---

[6] The second dissent weakly suggests that parents have a due-process right to send their children to public schools practicing unconstitutional discrimination. *See* Second Dissent at 90–92. As support, it cites *Pierce v. Soc'y of the Sisters*, 268 U.S. 510 (1925), and *Meyer v. Nebraska*, 262 U.S. 390 (1923). However, these decisions say no such thing. *Pierce* merely held that states cannot force parents to send their children to public schools. *See* 268 U.S. at 535. *Meyer* overturned a statute that forbade teaching in any language except English. *See* 262 U.S. at 400–03. Neither held that parents have a due-process right to subject their offspring to traumatic psychologic damage at public schools that run afoul of the Equal Protection Clause.

49

develop racially segregated institutions in the name of "educational progress"?[7] Must state schools be allowed to develop pilot programs promoting certain handpicked religions if enough parents ask for them?

If we take the second dissent at its word, its answer to these questions must be "yes." That's because, in the second dissent's world, the ends—nebulously defined "educational progress"—justify the means—forcing girls to wear impractical, uncomfortable, and revealing skirts that negatively affect their development and self-esteem.

In that inverted world, the Constitution is not the primary safeguard of civil liberties but an inconvenient wellspring of frivolous lawsuits, *id.* at 94–95; equal protection of the law is not a basic principle of freedom but a "rigid" and "calcif[ying]" tool of "monolithic" thought that "stamp[s] out the right of others to hold different values and to make different choices," *id.* at 85, 89, 93, 95; and unconstitutional discrimination is not the scourge of liberty and progress but the price of "innovation" and "diversity," *id.* at 84.

Two hundred and fifty years of innovation and ingenuity—*enabled* by our American constitutional system—say otherwise. For a shining example, look no further than the very North Carolina public schools the second dissent so casually demeans as mere tools of "social homogenization." *Id.* at 85. Though they are bound to follow the Constitution, these schools nevertheless offer diverse, innovative, and cutting-edge curricula to students of all

---

[7] Though the second dissent does not truly tangle with the ramifications of its argument, the obvious implication of its opinion is that unconstitutional school segregation could have been maintained in the nation's public-school systems if only the segregationists had been clever enough to designate their racist institutions as "charter schools."

ages, abilities, and beliefs. *See, e.g.*, Mary Ann Wolf, *N.C. Public Schools Offer Families More Choices than Ever*, WRAL.com (Dec. 20, 2021), https://www.wral.com/mary-ann-wolf-n-c-public-schools-offer-families-more-choices-than-ever/20043414/ (describing how North Carolina "school districts offer students options in Career and Technical Education; hands-on learning in STEM-focused schools and curricula; specialized programs focused on music, dance, or visual arts; virtual, personalized learning through the public school system through the NC Virtual Academy; and options to accelerate learning through early college high schools") (saved as ECF opinion attachment 3).

The second dissent retorts that there is still value in "[p]reserving [*additional*] variety," even if that means retaining educational philosophies—like the sexist dress code at issue here—that are arguably "coercive and antithetical to student choice." Second Dissent at 94. After all, the second dissent argues, "[n]o one is forced to go to a charter school, and certainly not to [Charter Day]." *Id.* And while discriminatory schools like Charter Day "may not suit the tastes of some, there should be no problem with letting others make that choice." *Id.* Criticizing others for making such a choice, according to the second dissent, is akin to "[c]astigating the chef for including salmon as an option (or a fellow customer for ordering it) . . . when you can order steak for yourself." *Id.*

But comparing the decision to attend a traditional public school or a discriminatory charter school to selecting "steak" or "salmon" on a restaurant menu leaves a bad taste in the mouth. *Id.* Subjecting girls to gender discrimination that causes lasting psychological damage is not the same thing as ordering fish. And though the second dissent fails to note it, there may be many practical reasons why a parent would want to pick "salmon" and

51

their send their child to Charter Day—the location, intellectual rigor, high-performing sports teams, excellent music program, carpool availability, connections with friends, etc.—and still be unhappy with the school's blatantly discriminatory dress code. That seems to be more or less true of the plaintiffs in this case. And as much as the second dissent may not like it, the Constitution provides them a remedy to redress that harm.

Even if the second dissent's "surf-or-turf" argument were relevant to the state-action question—which it is not[8]—its reasoning cannot be squared with settled constitutional jurisprudence. Under the second dissent's view, parents should have no constitutional remedy to address discrimination at their children's schools if those parents have *the option* of choosing between constitutional and unconstitutional alternatives. *See id.* at 88 ("So what if certain charter schools . . . reside at the more [unconstitutional] side of the spectrum? I'm okay; you're okay."). But if that were true, a protestor unconstitutionally denied the right to assemble in one location has no claim if he could protest somewhere else; a Christian church denied the right to fly its flag in front of city hall has no constitutional redress if it could fly its flag at the courthouse next door; and a firearms enthusiast denied her constitutional right to carry a weapon in one city has no argument if she could exercise her right by moving up the interstate.

But no court has ever held that constitutional "dead zones" like these are permissible so long as enough people like them that way. *See Fordice*, 505 U.S. at 743 (rejecting

---

[8] As the majority ably explains, the "ability of North Carolina's students to opt out of discriminatory treatment does not determine whether that treatment is attributable to the state." Majority Op. at 20.

plaintiffs' request to upgrade facilities at strictly Black colleges "*solely* so that they may be publicly financed, exclusively [B]lack enclaves by private choice" because such a schema would violate the Constitution). Therefore, the second dissent's attempt to work around the Constitution must fail.

### III.

In the end, the second dissent's policy arguments must be rejected. The second dissent's borderline insulting insinuations regarding HBCUs do not support its flawed parade-of-horribles argument. And contrary to the second dissent's insinuations, the specter of parental choice is not a trump card that gives North Carolina public schools license to practice unconstitutional discrimination.

BARBARA MILANO KEENAN, Senior Circuit Judge, with whom Judge THACKER joins, concurring:

The defendants would have us believe that the skirts requirement is merely another school regulation largely endorsed by CDS parents. According to the defendants, because girls at CDS "succeed" in academic and extracurricular activities, the skirts requirement is harmless in its effect on CDS' students.

I write separately to emphasize my strong disagreement with this view, which not only is antediluvian but also answers the wrong question. Left unanswered is the full spectrum of success that female students *might have achieved* if they had not been subjected to the pernicious stereotypes underlying the skirts requirement. It is irrelevant how well these students performed *despite* carrying the burden of unequal treatment. We cannot excuse discrimination because its victims are resilient enough to persist in the face of such unequal treatment.

Our nation's public schools serve the crucial societal function of educating students not only in academics, but also in the fundamental principle of equality under the law. The defendants' narrow focus on girls' ability to achieve academic success despite the skirts requirement fails to address girls' psychological well-being, as well as the social development of both boys and girls.

The record is clear. By reducing girls to outdated caricatures of the "fairer" sex, the gender stereotypes animating the skirts requirement negatively impact female students throughout their educational experience. CDS' stereotyped rationale for the skirts requirement – that girls are "fragile" and require protection by boys – is both offensive and

54

archaic. As one expert in the case explained, pants are a "ubiquitous," "uncontroversial," and "standard part" of women's professional wardrobes today.

Another expert opined that the skirts requirement "contradict[s] modern educational practices that foster independence, agency, and self-confidence," by "teach[ing] both boys and girls that girls should value appearance over agency, and attractiveness over autonomy." The record shows that these stereotypes can have dire psychological consequences for girls, including increased incidences of eating disorders, depression, anxiety, low self-esteem, and engagement in risky sexual behaviors.

This expert evidence confirms what we already know through common sense and lived experience, namely, that gender stereotypes are harmful to girls. As female students at CDS themselves explained, through the skirts requirement, CDS conveys its view that girls are not "worth as much as boys," are "not in fact equal to boys," and are "more delicate" than boys, which view results in boys being elevated to a "position of power over girls." What other conclusion can girls draw when they are told as kindergarteners to "sit like princesses" to avoid exposing their underwear, while boys may sit cross-legged? Or that girls cannot play as freely as boys during recess? Or that girls cannot participate comfortably in emergency drills for fear that boys will look up their skirts? When faced with this relentless messaging of inferiority, female students at CDS could only conclude that they must maintain constant vigilance about their physical appearance, and that the comfort of boys is more valued than their own.

The negative impact of such gender stereotypes is not limited to girls. Evidence in the record shows that children who believe in such views are more likely to engage in

gender-segregated play, which later can affect their communication skills and personal relationships. Most disturbingly, that evidence also shows that boys who hold stereotype-infused beliefs about gender are more likely to be the perpetrators of sexual harassment. Plainly, these outcomes are a far cry from "respect," traditional or otherwise, among and for all students.

Of course, the skirts requirement is merely one component of CDS' imposition of "traditional gender roles" on its young students. According to CDS, its female students are "fragile" and must acquiesce to having boys hold umbrellas over them when it rains. Considering this jaw-dropping assessment of girls' capabilities, we may never know the full scope or all the consequences of CDS' blatant, unapologetic discrimination against its female students. But the skirts requirement, harmless as it may seem to the defendants, requires only a pull of the thread to unravel the lifelong social consequences of gender discrimination. In 2022, there is no conceivable basis for allowing such obstacles to girls' progress in our public schools.

QUATTLEBAUM, Circuit Judge, with whom Judges RICHARDSON and RUSHING join dissenting in part and concurring in part, and with whom Judges WILKINSON, NIEMEYER and AGEE join dissenting in part:

The question is not whether we like or don't like Charter Day School's requirement that female students wear skirts, skorts or jumpers, or whether we think the requirement is good or bad for female students. We face a legal question—is Charter Day School a state actor? It's a question of our legal judgment, not our will. *See* The Federalist No. 78 (Alexander Hamilton) ("The courts must declare the sense of the law; and if they should be disposed to exercise WILL instead of JUDGMENT, the consequence would equally be the substitution of their pleasure to that of the legislative body."). If Charter Day School is not a state actor, 42 U.S.C. § 1983 cannot be used to prevent it from requiring female students to wear skirts, skorts or jumpers as part of its dress code. If it is a state actor, it is subject to a § 1983 claim.

Prior to today, neither the Supreme Court nor any federal appellate court had concluded that a publicly funded private or charter school is a state actor under § 1983. The majority, however, breaks that new ground. In my view, in deciding that a private operator of a North Carolina charter school is a state actor, the majority misconstrues and ignores guidance from the Supreme Court and all of our sister circuits that have addressed either the same or very similar issues. The immediate casualty of the majority's decision is a small part of a dress code at a particular charter school. That is the least of my concerns. My worry is that the majority's reasoning transforms all charter schools in North Carolina, and likely all charter schools in the other states that form our circuit, into state actors. As a result, the innovative alternatives to traditional public education envisioned by North

57

Carolina when it passed the Charter Schools Act, and thus the choices available to parents, will be limited.

But the implications of the majority's decision extend beyond even charter schools. By casting aside guidance from Supreme Court precedent, the majority significantly broadens the scope of what it means for the actions of a private party to be attributed to the state for purposes of a § 1983 claim. Frankly, it is hard to discern, much less define, the limits of what constitutes "state action" after the majority's decision.

I would reverse the district court's equal protection ruling and its decision that the charter school operators here are state actors. Consequently, I dissent in part.[1]

I.

A.

In the mid-1990s, the North Carolina General Assembly passed the Charter School Act. *See* N.C. Gen. Stat. § 115C-218, *et seq.* The law "authorize[d] a system of charter schools to provide opportunities for teachers, parents, pupils, and community members to establish and maintain schools that operate independently of existing schools." *Id.* § 115C-218(a). Charter schools were designed to "[i]mprove student learning" and "[e]ncourage the use of different and innovative teaching methods." *Id.* § 115C-218(a)(1), (3). The goal was to "[p]rovide parents and students with expanded choices in the types of educational

---

[1] I agree with the majority that dress codes are not excluded from Title IX's reach. I also agree that because the district court did not address the merits of plaintiffs' Title IX claim, remand is appropriate. Thus, I also concur in part.

58

opportunities that are available within the public school system." *Id.* § 115C-218(a)(5). Any child eligible to attend a public school may choose to attend a charter school, but no one has to attend one. *Id.* § 115C-218.45(a)–(b).

Although charter schools are nominally public schools under North Carolina law, they are operated by private, nonprofit corporations rather than the local public school board. *See id.* § 115C-218.15. In fact, the nonprofit's board of directors—not the state or local educational bodies or officials—must decide matters related to the school's operation. *Id.* § 115C-218.15(d). Charter schools have wide latitude to experiment with pedagogical methods and are exempt from statutes applicable to local boards of education. *See id.* § 115C-218.10. Instead, they are governed by their charter, or contract, between the nonprofit corporation and the state. *Id.* § 218.15(c). The charter provides the primary means of state accountability over charter schools. If the corporation violates any charter provision or underperforms, the state can revoke the charter. *See id.* § 115C-218.95. Although charter schools must adopt policies governing student conduct and discipline, the state does not supervise the content of those policies. *Id.* §§ 115C-218.60, 115C-390.2(a). Relevant here, no state law or charter provision requires a dress code nor dictates the contents of any such code that might be adopted. Further, the charter incorporates the protections of the United States and North Carolina constitutions, including their equal protection provisions.

59

B.

Charter Day School, Inc. ("CDS")[2] is a nonprofit corporation that holds a charter from North Carolina. Baker Mitchell incorporated CDS in 1999, intending to open a charter school in rural Brunswick County. CDS at first served just over fifty students. It has grown substantially and currently educates over 900 elementary and middle school students. CDS's volunteer board of directors sets the school's policies. Mitchell was first the chairman of the board, but he is now the board's secretary, a non-voting position.

CDS entered into an "educational management contract" with the Roger Bacon Academy, Inc. ("RBA") to manage day-to-day operations at CDS. RBA is a for-profit corporation, which Mitchell also founded and wholly owns. CDS's charter application was filed along with RBA, with Mitchell as the signatory. The charter incorporated the management agreement between CDS and RBA, which delegates to RBA management of all day-to-day operations of the school, including enforcement of "the rules, regulations and procedures adopted by [CDS]." *See* J.A. 360.

CDS operates as a school promoting traditional values. It advances a "traditional curriculum, traditional manners and traditional respect." J.A. 1719. Students must use polite forms of address, such as "Ma'am" and "Sir." J.A. 1967. It also embodies a classical curriculum, which focuses on literature, history and Latin. As part of this traditional approach, the school adopted a uniform policy.

---

[2] Like the majority, I use "CDS" to refer not only to the private operator of the school, but also Charter Day School.

The dress code, according to CDS and RBA, helps "instill discipline and keep order." J.A. 2079. All students must wear white or navy-blue tops and khaki or blue bottoms. Shirts must be tucked in and only closed-toed shoes are allowed. In addition, there are some requirements that apply only to males or females. Males may not wear jewelry and must keep hair "neatly trimmed and off the collar . . . and not below the top of the ears or eyebrows." J.A. 101. Males must also wear a belt. But while males may wear pants or shorts, females must wear skirts, jumpers or skorts, which can be paired with socks, stockings or leggings for warmth. On days with physical education class, however, students have different uniforms. On those days, females may wear gym shorts or sweatpants. The skirts requirement is sometimes waived on special occasions, such as field trips.[3]

If a student violates the dress code, the school typically notifies the parents, which is intended to be informative rather than punitive. A student may also be pulled from class to obtain compliant attire. And while students, in theory, may face expulsion for violating the school's disciplinary code, which includes the dress code, according to CDS no student has been expelled for a uniform policy violation.

One of the plaintiffs, Bonnie Peltier, a parent who chose to enroll her kindergartener at CDS, asked about the reasons for the skirts requirement at an orientation. School officials directed her to contact Mitchell. Mitchell responded to her email, explaining that Charter Day was "determined to preserve chivalry and respect among young women and men,"

---

[3] Because the parties and the majority refer to the requirement that girls wear skirts, jumpers or skorts as the "skirts requirement," I will as well for simplicity. By doing so, however, I do not intend to suggest that the options other than skirts are irrelevant.

and there was a need to "restore, and then preserve, traditional regard for peers." *See* J.A. 70–71. Believing the skirts requirement to be discriminatory, Peltier, through counsel, requested the school change it. CDS denied that request, responding that the uniform policy was adopted "to establish an environment in which our young men and women treat one another with mutual respect." J.A. 427.

## C.

Subsequently, three female students—a kindergartener and a fourth and eighth grader—through their parents, sued to challenge the skirts requirement as unlawful under Title IX, the Equal Protection Clause and North Carolina law. Naming CDS, its board members in their representative capacities and RBA as defendants, they asserted a Title IX claim, a § 1983 claim for violation of the Equal Protection Clause of the United States Constitution, an equal protection claim under the North Carolina Constitution, and third-party beneficiary breach of contract claims under North Carolina law based on the charter's incorporation of the equal protection provisions of the United States and North Carolina constitutions. After the district court denied defendants' motion to dismiss, the case proceeded to discovery.

During discovery, plaintiffs claimed the skirts requirement created practical problems. The girls testified that they could not move as comfortably in their skirts, which led them to avoid activities during recess. It also required them to cross their legs or keep their knees together while sitting and "distracted [them] from [their] academic work." *See* J.A. 503–04. They also testified that wearing leggings with a skirt did not keep them as warm in the winter as pants would have.

Along with these practical concerns, plaintiffs also expressed concerns about the psychological effects of the requirement. One plaintiff testified that the requirement conveyed the message that "girls should be less active than boys and that they are more delicate than boys. This translates into boys being put in a position of power over girls." J.A. 499. Plaintiffs' expert, a developmental psychologist, testified that research shows "[r]equiring girls to wear skirts reinforces antiquated gender roles in which girls are viewed as passive and focused on their appearance instead of agency." J.A. 2467 n.3.[4]

CDS officials explained that the requirement promotes chivalry, models the difference between male and female students and promotes the proper treatment of young women. It also introduced evidence about the growth of the school and academic and extra-curricular success of CDS's students.

D.

After discovery, the parties filed cross-motions for summary judgment, and the district court delivered a mixed ruling. The district court granted summary judgment for plaintiffs on the § 1983 claim against CDS, but not RBA. It granted summary judgment for defendants, however, on the Title IX claim. In its ruling on the § 1983 claim, the district court found that CDS was a state actor as it provided free public education. As for the Title IX claim, the district court found that Title IX did not apply to sex-specific school dress

---

[4] Plaintiffs seize on emails from Mitchell where he asserted the skirts requirement related to the view that females are "fragile vessels" deserving "gentle" treatment from male students. My dissent should not be construed to endorse those statements. But no matter how offensive, those comments should not distract us from the important legal principles at stake here.

63

codes. The district court denied summary judgment without prejudice on the state law claims, allowing for the possibility of further litigation on those claims.

Defendants sought to appeal the district court's ruling. The district court determined there was no just reason for delay and entered partial final judgment on its equal protection and Title IX rulings. *See* Fed. R. Civ. P. 54(b). In doing so, it permanently enjoined CDS from enforcing the skirt requirement. CDS timely appealed the grant of summary of judgment to plaintiffs on the equal protection claim, and plaintiffs cross-appealed the grant of summary judgment to defendants on the Title IX claim and to RBA on the equal protection claim.

As noted above, I join in the Title IX portion of the majority's opinion. Therefore, I limit my comments to the majority's determination that CDS is a state actor for purposes of plaintiffs' § 1983 claim.

## II.

The critical question for plaintiffs' equal protection claim is whether CDS and RBA are state actors against which a § 1983 claim may be maintained. Following Supreme Court guidance and the persuasive authority of every one of our sister circuits that has addressed this or similar issues, they are not.

### A.

A plaintiff can only succeed on a § 1983 claim if a defendant acts "under color of" state law. 42 U.S.C. § 1983. Therefore, § 1983 does not regulate "private conduct, no matter how discriminatory or wrongful." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40,

64

50 (1999). In some cases, however, a private actor's conduct may be considered state action rather than private action.[5] To determine whether a private actor engages in state action for § 1983, we ask, "is the alleged infringement of federal rights fairly attributable to the State?" *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982) (internal quotation marks omitted). So in this case, "[i]f the action of the respondent school is not state action, our inquiry ends." *Id.*

I agree with the majority that the Supreme Court precedent lacks a neat analytical structure to answer this question. *See Arlosoroff v. Nat'l Collegiate Athletic Assoc.*, 746 F.2d 1019, 1021 (4th Cir. 1984) ("There is no precise formula to determine whether otherwise private conduct constitutes 'state action.'"); *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Assoc.*, 531 U.S. 288, 295–96 (2001) ("[N]o one fact can function as a necessary condition across the board for finding state action; nor is any set of circumstances absolutely sufficient, for there may be some countervailing reason against attributing activity to the government.").

But, even without a neat analytical structure, the Supreme Court has provided clear guidance for how we should analyze whether a privately operated school can be a state actor. The leading case in this area is *Rendell-Baker*. There, the Supreme Court analyzed whether a nominally private school that functioned almost exclusively as a government

---

[5] Whether a private actor's conduct is "under color of [state] law has consistently been treated as the same thing as the 'state action' required under the Fourteenth Amendment." *United States v. Price*, 383 U.S. 787, 794 n.7 (1966). Therefore, we are guided by cases dealing with both provisions.

contractor was a state actor. 457 U.S. at 837. The private school was operated by a board of directors with no public affiliation. *See id.* at 832. It specialized in teaching students with drug or behavioral problems, or other special needs. *Id.* Nearly all of the students were referred by the public school system or drug courts, and the local public school committees paid the tuition of students they referred, which, when combined with other state and federal funding, resulted in somewhere between 90–99% of the school's operating budget each year. *Id.* The school also issued diplomas certified by the local public school board. *Id.* In order to receive state funding, the school had to comply with a variety of "detailed regulations concerning matters ranging from recordkeeping to student-teacher ratios," as well as certain "personnel standards and procedures." *Id.* at 833. And as a "contractor" with the state and local public school committee, the school had to provide certain individualized services for students. *Id.* at 833.

Even though the school in *Rendell-Baker* derived nearly all its funding from, and was regulated by, the state, the Supreme Court held it was not a state actor when the school fired certain employees. *Id.* at 837. The Court began its analysis by discussing *Blum v. Yaretsky*, 457 U.S. 991 (1982), which instructed that near-total public funding does not turn private action into state action. *See Rendell-Baker*, 457 U.S. at 839–40. Then, the Court reasoned that although the state extensively regulated the school, "the decisions to discharge the [employees] were not compelled or even influenced by any state regulation." *Id.* at 841. Finally, in considering whether the school was performing a traditionally exclusive public function, the Court noted that although "the education of maladjusted high

66

school students is a public function," it was not "the exclusive province of the State." *Id.* at 842. Instead, it was a "legislative policy choice" to provide that public function. *Id.*

Thus, *Rendell-Baker* provides three important principles for our state actor analysis: (1) near-total or even total state funding carries little weight; (2) regulation by the state of the conduct in question is insufficient—the state must compel or coerce the conduct; and (3) the conduct at issue must be the historic exclusive prerogative of the state to qualify as state action.[6]

And beyond the Supreme Court, every other circuit to have analyzed whether private schools or charter schools are state actors has followed the reasoning in *Rendell-Baker*. The First Circuit rejected a claim that a privately operated school, which contracted with the state to be the exclusive provider of public education in a district, was a state actor when disciplining a student. In reaching this decision, the court ruled the school did not perform an exclusive public function. *See Logiodice v. Trustees of Maine Cent. Inst.*, 296 F.3d 22, 26–27 (1st Cir. 2002) ("Education is not and never has been a function reserved to the state."). It noted that "even publicly funded education of last resort was not provided exclusively by government in Maine." *Id.* at 27.

The Third Circuit similarly concluded a publicly funded school that educated juvenile sex offenders was not a state actor. It explained that "[a]s was true of the [school]

---

[6] *Rendell-Baker* also found no "symbiotic relationship" between the school and the state that would have been similar to the relationship in *Burton v. Wilmington Parking Authority*, 365 U.S. 715 (1961). *See* 457 U.S. at 842–43. The same applies equally to Charter Day. There is no symbiotic relationship here.

in *Rendell-Baker*," the school did not perform a function traditionally within the exclusive province of the state. *Robert S. v. Stetson Sch., Inc.*, 256 F.3d 159, 166 (3d. Cir. 2001) (Alito, J.). The court also relied on the fact that the state neither compelled nor influenced the conduct at issue. *Id.* at 165.

And in a case almost identical to this one, the Ninth Circuit held that a private nonprofit corporation that operated a public charter school was not a state actor when it took employment actions against a teacher. *Caviness v. Horizon Cmty. Learning Ctr., Inc.*, 590 F.3d 806, 808 (9th Cir. 2010). It began its analysis explaining that the state's statutory designation of the charter school as a public school was insufficient on its own to make the school a state actor for all purposes because that designation does not "resolve the question whether the state was sufficiently involved in causing the harm to plaintiff." *Id.* at 814 (internal quotation marks omitted). It then determined that *Rendell-Baker* "foreclosed" the argument that "public educational services" are "traditionally and exclusively the province of the state." *See id.* at 815. And because no regulation compelled the employment decision at issue, the court determined that the charter school was not a state actor. *See id.* at 816–17.

Accordingly, our sister circuits confirm what the Supreme Court taught in *Rendell-Baker*. First, state funding has little to no bearing in the state actor analysis. Second, the challenged conduct must be compelled or coerced by the state to constitute state action. And third, publicly funded education is not the traditional, historic province of the state.

68

B.

These principles the Supreme Court articulated in *Rendell-Baker* and followed by our sister circuits for determining whether a charter school is a state actor make clear that CDS is not subject to liability under § 1983.

First, while CDS receives over 90% of its funding from the state, so did the school in *Rendell-Baker*. And the schools in *Logiodice*, *Robert S.* and *Caviness* also received all or the vast majority of their funding through the state. Thus, this factor does not convert private conduct into state action.

Second, as the Supreme Court has made clear, the state must compel or coerce the challenged conduct. *Rendell-Baker*, 457 U.S. at 840–42; *Blum*, 457 U.S. at 1004 ("[O]ur precedents indicate that a State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State."). Regulation is not enough. No one even suggests North Carolina compelled or coerced CDS's dress code. This absence of coercion is fatal to plaintiffs' claims.

Considering regulation more generally, charter schools in North Carolina operate independently of local school boards. N.C. Gen. Stat. § 115C-218.15. CDS's board of directors, which the government has no role in selecting, must—not may—"decide matters related to the operation of the school, including budgeting, curriculum, and operating procedures." *Id.* § 115C-218.15(d). CDS "is exempt from statutes and rules applicable to a local board of education." *Id.* § 218.10. And while charter schools must "adopt policies to govern the conduct of students and establish procedures to be followed by school officials

69

in disciplining students," the state does not approve or supervise the content of those policies. *See id.* § 390.2(a). Put simply, apart from the fact that CDS nominally bears the public school label, North Carolina takes a hands-off approach in deciding or supervising the school's policies. North Carolina is so hands-off, in fact, that it disclaims liability "for any acts or omissions of the charter school." *Id.* § 115C-218.20(b). Further, the Supreme Court of North Carolina held just last year "that the General Assembly did not intend for charter schools to be deemed to be agencies or instrumentalities of the State," thereby precluding those schools from sovereign immunity. *State ex rel. Stein v. Kinston Charter Acad.*, 866 S.E.2d 647, 659 (N.C. 2021).

Third, the education provided by CDS is not the exclusive, historic province of the state. *Rendell-Baker* instructs that in considering this issue, we should look to the function the school provided. There, the Court asked whether "the education of maladjusted high school students" was "the exclusive province of the State." *Rendell-Baker*, 457 U.S. at 842. That was the function the school provided, and the Court determined it to be outside the state's exclusive province.

Applying that approach here, charter schools are meant to provide alternative methods of education outside the traditional state school system. CDS fulfills this role by educating elementary and middle school students using a classical curriculum. Thus, its function is to provide an alternative method of primary education.

Initially, the standard on this issue is high. "While many functions have been traditionally performed by governments, very few have been exclusively reserved to the

70

State." *Flagg Brothers Inc. v. Lefkowitz*, 436 U.S. 149, 158 (1978) (internal quotation marks omitted).

With that reminder from the Supreme Court in mind, private actors have a long history, both nationwide and in North Carolina, of carrying out primary education—especially alternative methods of primary education. From its early beginnings, the North Carolina legislature provided some public funds to private schools. *See, e.g.*, 1805 N.C. Sess. Laws 27 ("An Act Respecting the Warrenton Academy.") (granting a surplus of £250 in local tax revenue to Warrenton Academy).[7] And even with the growth of public schooling over time, private schools continued to provide alternative primary education opportunities. Indeed, the Supreme Court of North Carolina confirmed that "our constitution specifically envisions that children in our state may be educated by means outside of the public school system." *Hart v. State*, 774 S.E.2d 281, 293 (N.C. 2015).

In 2020, over 100,000 children in North Carolina attended a private school, including over 75,000 elementary and middle school students. *See* Chená T. Flood, N.C. Dep't Admin., *2020 North Carolina Private School Statistics* 2 (2020), *available at* https://files.nc.gov/ncdoa/Annual-Conventional-Schools-Stats-Report-2019-2020_1.pdf. Private schools, including both religious and independent schools, by their very nature provide diverse alternative curriculums and methods. Students that attend private schools

---

[7] This act by the legislature to benefit Warrenton Academy was recorded as likely "the first instance in the history of the State of local taxation for schools." *See* 2 United States Bureau of Education, Report of the Commissioner of Education for the Year 1896-1897 1393 (1898); *see also* Charles L. Coon, North Carolina Schools and Academies 1790-1840: A Documentary History, at xxxvi (1915).

in North Carolina may also receive state funding through scholarship grants based on financial eligibility. *See* N.C. Gen. Stat. § 115C-562.1, *et seq*. That is because North Carolina's constitution does not "prohibit the General Assembly from funding educational initiatives outside of [the public school system]." *Hart*, 774 S.E.2d at 290.

Along with private schools, homeschooling has always played a substantial role in our society as an alternative primary education method. *See generally Delconte v. State*, 329 S.E.2d 636 (N.C. 1985). Considering the long history of private schools and home schooling in North Carolina, providing an alternative method of primary education is not a function exclusively reserved for the state.

Consistent with this analysis, *Logiodice* involved a private school funded by the state and provided the only education in a particular district. Even so, the First Circuit held it did not perform a traditional, exclusive state function. And in *Caviness,* which involved the precise situation we have here—a public charter school—the Ninth Circuit reached the same result. Considering all of this, I conclude that CDS does not perform a traditionally exclusive state function.

In sum, like the schools in *Rendell-Baker*, *Logiodice*, *Robert S.* and *Caviness,* CDS is run by private actors that contract with the state. Like the schools in those cases*,* CDS receives nearly all its funding from the state. Students could attend a general public school instead, so they effectively, if not explicitly, opt in to attending the school.[8] CDS is under

---

[8] *Logiodice* is the exception to this. But even though there was no choice for students in that Maine school district besides the privately operated school, the First Circuit held the school was not a state actor. *See* 296 F.3d at 31.

72

even less state regulation than the school in *Rendell-Baker*. Indeed, the purpose of the charter school system in North Carolina is to promote experimentation and school choice through deregulation. *See* N.C. Gen. Stat. § 115C-218(a)(1), (3), (5), (6). In no way did North Carolina compel or coerce the dress code challenged by plaintiffs. And finally, the education provided by CDS is not the historic, exclusive province of North Carolina. Thus, the principles on which the Supreme Court decided *Rendell-Baker* and which our sister circuits have adopted compel the conclusion that CDS is not a state actor.

## C.

Although neither the Supreme Court nor any of our sister circuits have ever concluded that a publicly funded private or charter school is a state actor, the majority does so today. In my view, its analysis in reaching that conclusion varies between misconstruing and ignoring the principles provided by the Supreme Court.

The majority concludes that the "statutory framework of the North Carolina charter school system compels the conclusion that the state has delegated to charter school operators like CDS part of the state's constitutional duty to provide free, universal elementary and secondary education." Maj. Op. 19. To reach this conclusion, the majority relies on the requirement in North Carolina's Constitution that the state provide public education, *see* N.C. Const. art. IX § 2 (setting forth the state's obligation to provide for a "uniform system of free public schools"), and then on the statutory designation of a charter school in North Carolina as a "public school." But there are several problems with the majority's conclusion that North Carolina has in fact delegated its constitutional duty to charter schools.

73

1.

Let's begin with the majority's focus on North Carolina's designation of a charter school as a "public school." To be sure, the school in *Rendell-Baker* was a private school and CDS, although operated by a private nonprofit, is nominally a public school. But the Supreme Court has already instructed that statutory designations do not make a private actor's conduct state action. *See Jackson v. Metro. Edison Co.,* 419 U.S. 345, 350 n.7 (1974); *see also Brentwood Acad.*, 531 U.S. at 298 ("The nominally private character of the Association is overborne by the pervasive entwinement of public institutions and public officials in its composition and workings . . . .").

On this point, the majority asserts "[w]e are not aware of any case in which the Supreme Court has rejected a state's designation of an entity as a 'public' school under the unambiguous language of state law and held that the operator of such a public school was not a state actor." Maj. Op. 24. That is true as far as it goes, which is not far. *Rendell-Baker*—which involved a publicly funded private school—is the Supreme Court's only state action case in the context of publicly funded private or charter schools. But at least two Supreme Court cases have, in fact, rejected a state's public designation of entities that were not schools. In *Jackson*, the relevant Pennsylvania statutory law defined "all companies engaged in providing gas, power, or water; all common carriers, pipeline companies, telephone and telegraph companies, sewage collection and disposal companies; and corporations affiliated with any company engaging in such activities" as a "public utility." 419 U.S. at 350 n.7. Yet the Supreme Court, after conducting a state actor analysis, found that the utility company at issue was not a state actor even though it was designated

74

as public. *Id*. at 351–53. Also, in *Polk County v. Dodson*, 454 U.S. 312, 324 (1981), the Supreme Court held that a public defender was not acting "under color of state law in exercising her independent professional judgment in a criminal proceeding" despite its public designation. I see no basis for concluding that the Supreme Court's reasoning in these two cases would not apply to schools designated as public. Thus, *Jackson* and *Dodson* undermine the majority's reliance on CDS's public designation.

And the Ninth Circuit in *Caviness* held that the operator of a public charter school, our situation here, was not a state actor. Unlike the majority, our sister circuit follows the guidance from the Supreme Court.

The majority also reasons that "substantial public funding, while not determinative, is a factor that we weigh in determining state action." Maj. Op. 18. I suppose weighing it is fine. But *Rendell-Baker* tells us that its weight is exceedingly light.

Finally, the majority argues that the public designation of charter schools represents North Carolina's exercise of its sovereign prerogative. It, therefore, reasons that concluding that CDS is not a state actor undermines principles of federalism. Maj. Op. 25 ("It was North Carolina's sovereign prerogative to determine whether to treat these state-created and state-funded entities as public. Rejecting the state's designation of such schools as public institutions would infringe on North Carolina's sovereign prerogative, undermining fundamental principles of federalism."). Aside from being inconsistent with the decisions described above, this position is inconsistent with North Carolina law. As noted above, the North Carolina Supreme Court has held "that the General Assembly did not intend for charter schools to be deemed to be agencies or instrumentalities of the State." *Kinston*

75

*Charter Acad.*, 866 S.E.2d at 659. Any exercise by North Carolina of its sovereign prerogative in designating charter schools as public is at best limited. Last, the majority's reliance on federalism is indeed ironic when its holding stretches state action law to a place no federal appellate court has ever gone to impose federal § 1983 litigation on a separate sovereign's democratically enacted charter school system.

2.

Take next the majority's argument that North Carolina has, through its charter school system, delegated part of its constitutional duty to provide education. In this analysis, the majority relies primarily on *West v. Atkins*, 487 U.S. 42 (1988). This reliance is misplaced. In *West*, the Supreme Court held that a physician who contracted with the state to provide medical services to prison inmates was a state actor when treating patients. *Id.* at 54. The Court pointed to the constitutional obligation under the Eighth Amendment to provide medical care to inmates, and it concluded the state abdicated this obligation by deferring solely to the contracted-physician's professional judgment. The physician was therefore "authorized and obliged to treat prison inmates" and "clothed with the authority of state law." *Id.* at 55 (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)).

But the circumstances in *West* are very different from those here. Unlike in *West*, the state here has not abdicated its constitutional obligation through a private contract. North Carolina never stopped providing a public school system free to all. It still operates public schools that can, and do, accommodate each child who wishes to attend. Providing an option of charter schools does not mean that North Carolina delegated its obligation to provide a public education system. To the contrary, charter schools are another option

76

beyond the "traditional public schools that have been established in order to comply with [Article IX of the North Carolina Constitution]." *See Sugar Creek Charter Sch., Inc. v. State*, 712 S.E.2d 730, 742 (N.C. Ct. App. 2011).

Relatedly, students at Charter Day have a choice that the inmate in *West* never had. The inmate in *West* had no choice but to submit to the services of the contracted physician the state provided. The majority dismisses the point stating it "does not bear on the question whether CDS is a state actor." Maj. Op. 20. While it may be of little relevance to the majority, it is not to the Supreme Court. In fact, emphasizing this point, the Court noted that "[i]t is *only* those physicians authorized by the State to whom the inmate may turn." *West*, 487 U.S. at 55 (emphasis added). It thus concluded that if the physician was deliberately indifferent in providing treatment, that harm "was caused . . . by the State's exercise of its right to punish West by incarceration and to *deny him a venue independent of the State to obtain needed medical care*." *Id.* (emphasis added). In other words, unlike the situation here, the inmate had no choice but to submit to the state's medical services, and the state chose to fulfill its obligation through a private actor wholesale.[9]

In contrast, CDS students have a choice. They were never "den[ied] . . . a venue independent of the State," nor were they "den[ied] . . . a venue" that North Carolina had a constitutional obligation to provide. *Id.* Any student in North Carolina may still attend a

---

[9] *West* is no outlier on this point. *Rendell-Baker* also supports the importance of choice. It noted that "[a] student identified as having special needs and recommended for placement in private school may remain in public school, if his parents object to a placement in a particular private school." 457 U.S. at 832 n.1.

traditional public school—which the state still fully operates. Because no student must attend Charter Day, and every student may still attend a traditional public school, North Carolina has not delegated its constitutional obligation to CDS. Thus, *West* does not suggest that CDS is a state actor.

Consistent with Supreme Court authority, *Caviness* and *Logiodice* also involved private operators of schools funded by the state as part of Arizona and Maine's constitutional duties to provide public education. *Caviness*, 590 F.3d at 813–14; *Logiodice*, 296 F.3d at 26–27. Yet both decisions concluded that those private operators were not state actors. Thus, the majority's reliance on North Carolina's obligation to provide public education conflicts with Supreme Court authority and persuasive guidance from our sister circuits.

3.

The majority also misapplies the traditional, historic state function analysis. In discussing this issue, it asks whether "free, public education" is traditionally an exclusive state function. That question is circular. By using outcome-determining adjectives such as "free" and "public," the majority "ignores the threshold state-action question." *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1930 (2019) (explaining that asking whether "the operation of a public forum for speech" was a traditional, exclusive government function improperly avoided the state action inquiry); *see also Logiodice*, 296 F.3d at 27 ("[T]here is no indication that the Supreme Court had this kind of tailoring by adjectives in mind when it spoke of functions 'exclusively' provided by government."). Instead, we must focus on what function the actor actually provides. As noted above,

78

charter schools provide alternative methods of education outside the traditional state school system. That function is not the traditional, exclusive prerogative of the state.[10]

4.

Then, the majority attempts to distinguish *Rendell-Baker*. It claims *Rendell-Baker* involved personnel decisions while the dress code goes to CDS's educational philosophy. The majority also suggests *Logiodice* and *Caviness* "do not impact our analysis" because they involve a personnel decision and a student discipline decision while CDS's dress code goes to its "educational philosophy." Maj. Op. 26. It is, of course, true that those decisions involved teacher personnel and student discipline issues. But nothing in those cases suggests those decisions turned in any way on the fact that they involved personnel or student discipline decisions. And none implied that things might be different if the challenged conduct went to the school's educational philosophy. It makes no sense to me that we would ignore the many similarities central to the reasoning of those cases and latch on to differences that played no part in the reasoning of those decisions.

---

[10] In fairness, while there is no support for the majority's approach, there is some support for a broader analysis. One could read decisions from our Court and the Ninth Circuit to suggest the proper analysis is education in general. *See Mentavlos v. Anderson*, 249 F.3d 301, 314–15 (4th Cir. 2001) (describing a public military college's function is not to provide military based education but rather to "to educate civilian students and produce community leaders" after looking to the school's stated mission); *Caviness*, 590 F.3d at 814–15 (holding *Rendell-Baker* "foreclosed" the argument that "public educational services" are traditionally an exclusive state function). If we were to adopt that approach, it would not change my analysis. There is no credible argument that education has been the traditional, exclusive prerogative of North Carolina.

79

5.

Finally, along with misapplying the principles provided by the Supreme Court, the majority ignores others. Most notably, the Supreme Court has told us that for private conduct to constitute state action, the state must compel or at least significantly encourage the conduct. *See Rendell-Baker*, 457 U.S. at 840; *Blum*, 457 U.S. at 1004. Here, the majority properly concludes that North Carolina did not coerce or compel the dress code generally or the skirts requirement specifically. *See* Maj. Op. 15. But it then ignores that critical fact's pertinence to the state action analysis.[11]

We cannot do that. Supreme Court precedent is not like the green vegetables on a buffet line that we can simply pass by for more dessert. Recognizing the lack of state coercion is not enough. We must apply that fact's implication as the Supreme Court has instructed us to do. And when we do, plaintiffs' § 1983 claim fails.

---

[11] The majority cites to *Brentwood* as justification for brushing this issue aside. It insists "a state's exercise of coercive power or compulsion is not a requirement for a finding of state action under Section 1983." Maj. Op. 14 (citing *Brentwood*, 531 U.S. at 295). But *Brentwood* did not say that. Instead, it explained a point no one denies—"no one fact can function as a necessary condition across the board for finding state action." *Brentwood*, 531 U.S. at 295. And after making that point, *Brentwood* emphasized the importance of "pervasive entwinement" of the state in the challenged conduct. *Id*. at 296. As the majority acknowledges, there was no "pervasive entwinement" by the state of the challenged conduct here.

80

D.

In sum, not all grievances are constitutional in nature. CDS's skirts requirement is not "fairly attributable" to the state. *Rendell-Baker*, 457 U.S. at 838.[12] Under Supreme Court precedent, as well as the persuasive reasoning of our sister circuits, the skirts requirement is CDS's own conduct, not North Carolina's. Because § 1983 does not regulate private conduct, plaintiffs' equal protection claim should be dismissed.[13]

And to be clear, concluding that CDS is not a state actor in promulgating its dress code for purposes of a §1983 claim does not give it, or any other charter school operator, a license to discriminate. The majority's assertion that, absent a finding that private operators of charter schools are state actors, victims of discrimination will have "no recourse other than seeking to have the school's charter enforced or revoked" is incorrect. Maj. Op. 28. True, North Carolina can ensure accountability through enforcement or revocation of its charter. CDS's charter, for example, requires compliance with civil rights laws, including applicable state and federal constitutional provisions. But several other mechanisms remain in place to prevent discrimination and to empower victims of discrimination to seek recourse. In fact, as already noted, plaintiffs here brought a third-party beneficiary claim based on that charter provision alleging equal protection violations, the resolution of which remains with the district court. In addition, federal civil rights statutes, like Title VI and

---

[12] For the same reasons, RBA is not a state actor either. RBA is even further removed from state action because its contractual relationship is with CDS, not the state.

[13] Because I conclude that CDS and RBA are not state actors, I do not address the merits of plaintiffs' equal protection claim.

81

Title IX, likely apply to most charter schools as recipients of federal funds. And states and localities may have their own civil rights laws applicable to charter schools. Between accountability measures at the local and the state level as well as robust civil rights laws, the lack of a federal Equal Protection Clause remedy under § 1983 does not enable a charter school to discriminate without consequence. So, in addition to being foreclosed legally, stretching to recognize a § 1983 claim under this scenario is unnecessary.

But besides being legally flawed and unnecessary, extending § 1983 relief to private operators of charter schools is ill-advised. Make no mistake about it, the majority's equal protection decision is no narrow ruling. To repeat, the majority concludes "the state has delegated to *charter school operators like CDS* part of the state's constitutional duty to provide free, universal elementary and secondary education." Maj. Op. 19 (emphasis added).

Under that reasoning, all North Carolina charter schools are state actors. And since many state constitutions require public education and many charter schools receive public funding despite their private operation, the majority's decision will likely reach beyond North Carolina. Thus, this decision will have ramifications far beyond any dress code requirement. Indeed, North Carolina's charter school program includes schools whose admissions policies favor economically disadvantaged students. It includes single-gender schools. While eliminating a skirts requirement may feel satisfying, a conclusion that also means those and all other charter schools fall within the majority's expansive view of state actor will have real consequences on states' efforts to improve education by offering innovative educational choices for parents.

82

Finally, how are litigants and district courts supposed to view the Supreme Court's guidance that for private conduct to constitute state action, the state must compel or at least coerce it? Does that still apply in the Fourth Circuit? Can courts now turn a blind eye to that issue when it gets in the way? And if we can ignore that factor, what about others? I do not see the limiting principles of the majority's decision.

III.

In conclusion, on plaintiffs' equal protection claim, I would reverse the district court's grant of summary judgment to plaintiffs against CDS and affirm the district court's grant of summary judgment to RBA.

WILKINSON, Circuit Judge, with whom Judges NIEMEYER and AGEE join, dissenting:

I respectfully dissent. The majority seeks to expand the concept of state action and the reach of Title IX to a point that will drape a pall of orthodoxy over charter schools and shift educational choice and diversity into reverse.

Because I agree with all the points made by Judge Quattlebaum on the state action question, I am pleased to join the dissenting portion of his excellent opinion. For myself, however, I would go further, and have the case remanded with directions to dismiss it. Here's why.

## I.

Since their introduction thirty years ago, charter schools have quickly spread to forty-five states and the District of Columbia. *See* Nat'l Ctr. for Educ. Stat., *Public Charter School Enrollment* (May 2021); Educ. Comm'n of the States, *50-State Comparison: Charter School Policies* (Jan. 28, 2020). The whole purpose of charter schools is to encourage innovation and competition within state school systems.

North Carolina, our focus here, provides by law that charter schools should "operate independently of existing schools" in order to "improve student learning," "encourage the use of different and innovative teaching methods," and "provide parents and students with expanded choices." N.C. Gen. Stat. § 115C-218(a)(1), (3), (5). North Carolina first committed to that course more than two decades ago with the Charter School Act. *See id.* § 115C-218, *et seq.* That law authorizes North Carolina to contract with private nonprofit corporations to independently run charter schools, *id.* § 115C-218.15(b)–(c), and to provide the schools with funding per pupil to use how they wish, *id.* § 115C-218.105. The charters

themselves reflect this variety. *See, e.g.*, J.A. 221 (noting that "the granting of a Charter in no way represents or implies endorsement by the [State] of any method of instruction, philosophy, practices, curriculum, or pedagogy used by the School"). The charter school's board of directors governs in "matters related to the operation of the school, including budgeting, curriculum, and operating procedures." *Id.* § 115C-218.15(d). North Carolina has 200 such charter schools, including Charter Day School (CDS), providing a rich array of choices for North Carolina parents and children. *See* N.C. State Bd. of Educ., 2020 Annual Charter Schools Report 3 (June 29, 2021). The entire emphasis of the above legal edifice is on educational choice, diversity, and independence.

The majority misses the whole purpose of the development of charter schools. It has little clue about the problems that led to the formation of the charter school experiment or the function that it serves. Its opinion is all about conformity. It is essentially dismissive of what charter schools might have to contribute, prejudging them as miscreants that must be brought to heel. *See, e.g.*, Majority Op. at 20 (worrying about the possibility of "blatant, unconstitutional discrimination committed by [charter] schools").

Public education with its learning standards and social homogenization has assisted the goal of universal literacy and the unifying creed of being an American. *See, e.g.*, *Mahanoy Area Sch. Dist. v. B.L.*, 141 S. Ct. 2038, 2046 (2021) ("America's public schools are the nurseries of democracy."). Yet today something seems different, as though calcification has set in. The very idea of a different model of schooling has drawn the ire of the public education establishment. As this case shows, any challenge to prevailing educational convention is met by circling the wagons. Well, okay—but plaintiffs are not

entitled to expand the whole notion of state action to aid and abet their insularity. Nor are they to assume that their perspective is definitive for purposes of Title IX.

Student dress codes in particular are unsettling to those who believe, as plaintiffs do here, that they connote feminine inferiority. *See* Majority Op. at 28. The codes are founded upon ideals of "chivalry," a word which to the majority suggests male condescension toward women and the need of women for male protection, which in turn robs women of their dignity and independence. *Id.* at 28–29. As Justice Brennan said some years ago, such "romantic paternalism" can "put women, not on a pedestal, but in a cage." *Frontiero v. Richardson*, 411 U.S. 677, 684 (1973) (plurality). No doubt my concurring friend espouses that perspective and frowns upon this dress code. *See* Concurring Op. at 54–56 (Keenan, J.). Fair enough. I understand and respect this view.

But the view is not universal. And the "cage" is one of imprisonment in our own perspective, a reluctance to recognize that across the great span of America, there are views that differ from the judge's own. To a great many people, dress codes represent an ideal of chivalry that is not patronizing to women, but appreciative and respectful of them. Far from being a pejorative term, chivalry is symbolic of the tone that CDS wishes to set. "Chivalry" harkens to the age of knighthood, defined as "[t]he brave, honourable, and courteous character attributed to the ideal knight." *Chivalry*, Oxford English Dictionary (2d ed. 1989). What the knights bestowed upon their ladies fair at the end of a tournament has become the bouquet of roses extended on stage at the close of an opera.

The majority seeks to portray the age of chivalry as a brutal time. *See* Majority Op. at 28. But that is hardly the point. CDS uses chivalry in an aspirational sense, not to recreate

86

an earlier time in all of its particulars, but to capture the contemporary connotations of a chivalric order as one in which women are due from the very inception of schooling the greatest measure of respect.

Whether a more chivalric order would in some way enhance mutual respect between the sexes, I hardly know. But one need only look to sexual assaults of women on campus, sexual harassment and belittlement of women in the workplace, sexual degradation of women on the internet, sexual trafficking of young women here and abroad, and spousal abuse of women in the home to know that all is not well. Views legitimately differ on the remedies for this condition. But CDS's chivalric approach should neither be legally banished from the educational system, nor should it be legally imposed.

For CDS, the dress code is an adjunct to an altogether lawful and legitimate view of education that relies upon a "classical curriculum espousing traditional western civilization values." J.A. 80. But CDS's traditional perspective has not been respected by those who disagree with it. Instead, those who promulgated a dress code aimed at cultivating "mutual respect" among men and women, J.A. 70, have been greeted with a boundless determination to litigate their views out of the charter school setting.

That is a shame. It is altogether good that opportunities now exist for women that did not exist in earlier generations. Women today serve as lawyers, doctors, executives, professors and professional athletes, among countless other worthy and admirable professions. *See, e.g.*, U.S. Dep't of Labor, *Percentage of Women Workers in Science, Technology, Engineering, and Math (STEM)*, https://www.dol.gov/agencies/wb/data/ occupations-stem (2019) (showing an increase in women in STEM occupations); U.S.

87

Dep't of Labor, *100 Years of Working Women*, https://www.dol.gov/agencies/wb/data/ occupations-decades-100 (2019) (showing substantially greater workforce participation and occupational diversity for women). As Vice President, House Speaker, and Supreme Court Justices, women hold positions at the highest level of all three branches of our government. These opportunities, though still not all they should be, are to be celebrated. The nation is stronger when it draws upon all its human resources and does not confine the genders to preconceived occupations and professions, as in times past.

But the new need not banish the old. The present need not invariably rush to discredit the past, lest the future hold our own intolerance to poor account. The advent of new possibilities need not extinguish more traditional gender roles which lend stability to home and family and ultimately to society itself. Indeed, many women embrace and balance both modern and traditional elements in their lives, to the benefit of the worlds of both work and family life. *See* U.S. Dep't of Labor, *Mothers and Families: Labor Force Participation*, https://www.dol.gov/agencies/wb/data/mothers-and-families (2020) (showing that nearly three-quarters of mothers with children under eighteen participate in the labor force). So what if certain charter schools or private schools reside at the more traditional side of the spectrum? I'm okay; you're okay. There is room for all in an educational system worth its salt.

## II.

The crucial question is one of student and parental choice. North Carolina has designed a system that allows parents and students to choose among varied options, and charter schools seek to preserve precisely that choice. N.C. Gen. Stat. § 115C-218(a)(5).

88

While some of these options espouse value systems with which the majority may disagree, that is no reason for it to stretch the Fourteenth Amendment to stamp out the right of others to hold different values and to make different choices.

## A.

Of course, the risk of the new stamping out the old is all too familiar. Justice Thomas, who has championed the concept of student choice in higher education, has cautioned against this same phenomenon playing out as it pertains to race. It is beyond question that desegregated colleges and universities are an altogether good thing. But that must not extinguish the place of historically black colleges and universities (HBCUs) in the educational system. *See United States v. Fordice*, 505 U.S. 717, 745, 748–49 (1992) (Thomas, J., concurring) (agreeing that states must eliminate "policies traceable to the *de jure* system [of segregation that] are still in force and have discriminatory effects," but emphasizing that this must not "portend . . . the destruction of historically black colleges"). The HBCUs were first developed to educate and nurture many of the brightest students in a state who, without the efforts of historically black institutions, would have been left with nowhere to go. It would be beyond cruel if institutions so crucial to African-American progress in the pre-*Brown* era were to find themselves collateral damage in the post-*Brown* order. HBCUs in fact are every bit as relevant in the present as in the past, as students of all races and ethnicities continue to see them as best suited both for developing their talents and for nurturing the self-confidence that every college student needs for success in the larger world.

The most beneficial progress gives us no license to "throw the baby out with the bath water" by undermining our most valued traditional elements. Clarence Thomas, Address at the National Historically Black Colleges and Universities Week Conference (Sept. 9, 2008). Instead, the state can and should "operate a diverse assortment of institutions." *Fordice*, 505 U.S. at 749 (Thomas, J., concurring). Of course, the HBCUs were in no way discriminatory. They illustrate, however, the importance of preserving student choice in education, even as they remain vulnerable to falling victim to contemporary political or judicial notions of exactly what a unitary school system should entail.

Again, the reconciliation of cultural tradition and modernity requires respecting student choice. The importance of choice need not be confined to higher education. It should, as it has, play a role in elementary and secondary education as well. State and local programs expanding private choices for elementary and secondary education have been widely implemented and consistently upheld. The Supreme Court has emphasized that school voucher programs are a legitimate way to provide "true private choice" among a slew of public and private schools. *Zelman v. Simmons-Harris*, 536 U.S. 639, 662 (2002). Those voucher programs are just one of many "publicly funded private school choice" programs designed to "raise the quality of education"; charter schools are another. *Id.* at 683, 683 n.9 (Thomas, J., concurring).

I am aware, of course, that nominally denominated "freedom of choice" plans were utilized by school boards in the 1960s to steer black and white students into segregated schools. *See Green v. Cnty. Sch. Bd.*, 391 U.S. 430, 442 (1968). But the record contains no

90

suggestion of any malign coercive practices here. I am also aware that such choice as exists at the secondary and elementary level is likely to be the parents' choice, whereas in higher education both parents and children come to a choice at the end of what might sometimes be termed a negotiated truce.

Yet whether the choice is a parental one or a student one does not negate its value. Indeed, the Supreme Court has vindicated the right of parents "to direct the upbringing and education of children under their control." *Pierce v. Soc'y of the Sisters*, 268 U.S. 510, 534–35 (1925); *see also Meyer v. Nebraska*, 262 U.S. 390, 401 (1923). It has explained that the "fundamental theory of liberty upon which all governments in this Union repose excludes any general power of the state to standardize its children by forcing them to accept instruction from public teachers only." *Pierce*, 258 U.S. at 535. For "[t]he child is not the mere creature of the state; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." *Id.*

The choice in *Pierce* was between public and private or parochial schools, but that choice is not so very different from the same parental decision-making exercised as to charter schools. Both *Pierce* and this case stand for the baseline proposition that parents have some right "to choose how and in what manner to educate their children." *Zelman*, 536 U.S. at 680 n.5 (Thomas, J., concurring). And this court has no power to "standardize" children by limiting that parental choice. *Pierce*, 258 U.S. at 535. Subsumed within the right to choose a charter school is not simply a right to enter a bricks-and-mortar structure, but a choice as to the cultural and curricular components of education advanced within school walls.

B.

While the parental right of choice is not unlimited, neither is this court's ability to restrict the options otherwise available to parents, either directly or by an expansive definition of state action. To say otherwise—to expand state action doctrine so that charter school choice is dramatically restricted—would create a tension within the Fourteenth Amendment as it relates to education. On the one hand, the Amendment's due process guarantee has been interpreted to provide a right of parental choice. *Pierce*, 268 U.S. at 534. But on the other hand, the majority would interpret that same Amendment's state action prong in such an expansive way as to limit the educational choices a state can make available. Courts cannot allow the Fourteenth Amendment to become a self-contradiction by reading it to "constrain a State's neutral efforts to provide greater educational opportunity" and school choices. *See Zelman*, 536 U.S. at 680 (Thomas, J., concurring).

In short, state action doctrine must not be warped to extinguish the vibrancy provided by school choice. For CDS's dress code here was certainly not state action. Charter schools are by their very nature freed from state control in their pedagogical and cultural choices; surely their dress codes cannot then be said to be "fairly attributable to the State." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982). Nor are dress codes or pedagogical policies—or even education more broadly, for that matter—public functions that have been "traditionally the exclusive prerogative of the State." *Rendell-Baker v. Kohn*, 457 U.S. 830, 842 (1982) (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 353 (1974)). To avoid this commonsense conclusion, the majority gerrymanders a category of free, public education that it calls a traditional state function. *See* Majority Op. at 19, 22

92

("[I]n operating a school that is part of the North Carolina public school system, CDS performs a function traditionally and exclusively reserved to the state."). This is nothing but a circular characterization assuming the answer to the very question asked.

As Judge Quattlebaum has noted, the fact that North Carolina funds CDS is of no moment. *See Rendell-Baker*, 457 U.S. at 840 (concluding that near-total state funding did not render school a state actor). States should be able to fund diverse educational options without incurring massive litigation costs. Nor is a charter school, by the mere presence of its charter, transformed into a state actor any more than the Virginia Company became one when it received a charter from King James in 1606. Chief Justice Marshall recognized this basic point in 1819, and it is no less true today. *See Trustees of Dartmouth Coll. v. Woodward*, 17 U.S. (4 Wheat.) 518, 638 (1819) ("From the fact, then, that a charter of incorporation has been granted, nothing can be inferred, which changes the character of the institution, or transfers to the government any new power over it.").

Were that not sufficient, here there are even further "countervailing reason[s] against" finding state action. *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001); *see also Polk Cnty. v. Dodson*, 454 U.S. 312, 318–19 (1981) (finding that a public defender employed by the state was not a state actor). Charter schools are expressly designed to be freer from state control, and to bring them progressively under such control is to deny their very reason for being. A state action finding here threatens these schools' independence and sends education in a monolithic direction, stifling the competition that inevitably spurs production of better options for consumers. Judicial restraint in turn requires that we stay hands-off. States and localities and schools and

93

parents and students will do just fine without our help and achieve educational progress on their own.

C.

It is said that dress codes are themselves coercive and antithetical to student choice. That misses the point. Preserving variety is the very reason to have a menu. You need not eat, or even like, everything on offer, and others' tastes may well differ from your own. Castigating the chef for including salmon as an option (or a fellow customer for ordering it) makes little sense when you can order steak for yourself. So too here. No one is forced to go to a charter school, and certainly not to CDS. *See* N.C. Gen. Stat. § 115C-218.45(b) ("No local board of education shall require any student . . . to attend a charter school."). North Carolina offers a wide-ranging menu of educational options. While CDS may not suit the tastes of some, there should be no problem with letting others make that choice.

This is no bizarre notion or partisan judicial push. Different presidents have recognized the important role charter schools play in providing valuable, innovative options for families. *See, e.g.*, Barack Obama, *Presidential Proclamation – National Charter Schools Week, 2016* (Apr. 29, 2016); George W. Bush, *Presidential Proclamation – National Charter Schools Week, 2007* (Apr. 27, 2007). The "valuable educational alternative" provided by charter schools, Bush, *supra*, plays an important role both in the lives of those who choose to attend them and in our society as a whole. Granted, a school like CDS is not for everybody. But it is there for those who want it, and their choice is due respect. The majority fails to offer even that much. Does it not see the irony of mandating uniformity by striking down CDS's uniform mandate?

94

And what is next? Will litigants seek to eradicate North Carolina's single-sex charter schools? *See, e.g.*, School of the Arts for Boys Academy, http://www.sabacademy.org (all-boys charter school in Chatham County, North Carolina); Girls Leadership Academy of Wilmington, http://www.glowacademy.net (all-girls charter school in Wilmington, North Carolina). Will some charter schools' recruiting and admissions decisions, undertaken in pursuit of serving underserved and dispossessed populations, be challenged on Equal Protection grounds? What about charter schools offering a progressive culture and curriculum? A state action finding here leaves charter schools of all stripes more vulnerable to attack. Regardless of the constitutional merits of such challenges, the costs of litigation may well accomplish opponents' lamentable goal of rendering such innovative and diverse programs an experiment that died aborning. Parents and students will feel a loss of participation in those very aspects of their lives that mean the most.

## III.

Plaintiffs have another arrow in their quiver: in their view, Title IX bars the dress code too. But this argument is just another way to impose a single rigid perspective on the most minute of schools' operational choices, and it fares no better. We should not read Title IX to intrude into local school decision-making where Congress's intention to do so, and state relinquishment of such control, was so highly uncertain.

### A.

It is far from clear that Title IX has anything to say about dress codes—in fact, there is good reason to think it does not. Four decades ago the Department of Education,

95

following a notice-and-comment process, withdrew a regulation which prohibited discrimination "in the application of codes of personal appearance," finding "no indication in the legislative history of Title IX that Congress intended to authorize Federal regulations in the area of appearance codes." 47 Fed. Reg. 32,526, 32,526–27 (July 28, 1982). While it retained other prohibitions under Title IX, the Department concluded that the "[d]evelopment and enforcement of appearance codes is an issue for local determination." *Id.* at 32,526.

At this point, we need not decide whether to afford this interpretation *Chevron* deference. The key is that both North Carolina and CDS agreed to accept federal funds under that clear and straightforward guidance: Title IX did not reach dress codes like this one. Recipients were told such decisions would instead be left to local decision-making.

Title IX "invokes Congress's power under the Spending Clause"; thus, it is "much in the nature of a contract: in return for federal funds, the recipients agree to comply with federally imposed conditions." *Barnes v. Gorman*, 536 U.S. 181, 185–86 (2002) (brackets and emphasis omitted) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)); *see also Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 640 (1999). Our "central concern" is therefore "with ensuring that the receiving entity of federal funds has notice" of the conditions to which it will be held. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 287 (1998) (internal quotation marks and brackets omitted)); *see also Davis*, 526 U.S. at 640. Indeed, the very "legitimacy of Congress' power to legislate" in this realm "rests on whether the recipient voluntarily and knowingly accepts the terms of the 'contract.'" *Barnes*, 536 U.S. at 186 (brackets omitted) (quoting *Pennhurst*, 451 U.S. at

96

17). So "if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 583 (2012) (plurality) (quoting *Pennhurst*, 451 U.S. at 17).

Surely CDS did not unambiguously give up its right to adopt a traditional sex-specific dress code merely by accepting a dollar of federal funds. It simply "strains credulity" to believe that funding recipients such as CDS "should have known" that Title IX prohibits sex-specific dress codes when the Department of Education—the very agency charged by Congress with implementing and enforcing Title IX regulations in this sphere—did not have that understanding. *See Pennhurst*, 451 U.S. at 25. The Department's published position, both in 1999 when CDS was incorporated and in 2015 when CDS signed its current charter, was that dress codes were not implicated by Title IX. And "liability is determined by[] the legal requirements in place when the grants were made" and "should be informed by the statutory provisions, regulations, and other guidelines provided by the [agency] at that time." *Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 670 (1985).

Despite this seemingly straightforward agency position, the majority says that the text of Title IX nonetheless unambiguously reaches dress codes. I struggle to see how this can be so. While no one disputes that we "must accord [Title IX] a sweep as broad as its language," *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 521 (1982) (citation omitted), broad language is not a blank check. Nor is breadth the same as clarity, which is at issue here.

97

Nobody has been clearly "excluded" from or "denied" anything, 20 U.S.C. § 1681(a); CDS offers the same educational programs to both sexes. And not all distinctions are discriminatory. "[T]he term 'discriminate against' refers to distinctions or differences in treatment that injure protected individuals," *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006), and "treat[] that individual worse than others who are similarly situated," *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1740 (2020). Though all agree that this dress code treats girls differently, eminently reasonable minds can and do disagree as to whether it treats them worse. For every parent that seeks to disparage a dress code like this one as harmful or discriminatory, there is another who would seek it out as beneficial. It is not our place to resolve this dispute right now, for whether or not a dress code that draws some sex-based distinctions *is* discriminatory, exclusionary, or benefit-denying, this very difference of opinion shows that it is certainly not *unambiguously* so.

The majority overlooks this entire point. In its view, every difference is by definition discriminatory. This sweeping notion leads it to show pitifully little respect for the value that charter schools might contribute to education. For the majority, this case is all about stomping out any variance at odds with modern sensibilities. So much so that the majority summons up fears of rank discrimination that are not at issue and that appear nowhere in this case. *See* Majority Op. at 28. It matters not that Congress and the Department of Education stopped well short of spelling out conditions that would sweep off the board innumerable classroom approaches and methodologies and countless attempts to harmonize instruction within the classroom with life outside.

98

Though "Congress need not spell out every condition with flawless precision for a provision to be enforceable," *W. Va. Dep't of Health & Hum. Res. v. Sebelius*, 649 F.3d 217, 223–24 (4th Cir. 2011) (citing *Bennett*, 470 U.S. at 666–69), here the agency itself has explicitly backed away from saying that this condition on federal funds exists. And it has persisted in sowing that uncertainty up to the present day. In the forty years since the Department rescinded its regulation, the agency has not even attempted to pass a regulation covering appearance codes. *See Davis*, 526 U.S. at 643–44 (looking to "the regulatory scheme surrounding Title IX" to determine if funding recipients had notice of a certain condition); *Rosa H. v. San Elizario Indep. Sch. Dist.*, 106 F.3d 648, 654 (5th Cir. 1997) (noting that "[f]ederal regulations similarly fail to indicate any expectation that school[s] will be [held] liable under Title IX").

Indeed, the agency has expressly refused to "take any position regarding the adoption of appearance codes by [schools] since this is a matter that should be left to local discretion." 47 Fed. Reg. at 32,527. At least twenty other agencies have opted to follow the Department of Education's lead in that regard. *See* 65 Fed. Reg. 52,859 (Aug. 30, 2000). Over those years, the caselaw has been mixed on this issue, but numerous cases have also suggested that sex-specific appearance codes do not violate Title IX. *See, e.g.*, *Hayden ex rel. A.H. v. Greensburg Cmty. Sch. Corp.*, 743 F.3d 569, 577–78 (7th Cir. 2014) (collecting cases). Even commentators who would banish such dress codes from schools acknowledge that the Department's actions make it unlikely that Title IX reaches dress-code claims. *See* Jennifer L. Greenblatt, *Using the Equal Protection Clause Post-*VMI *to Keep Gender Stereotypes Out of the Public School Dress Code Equation*, 13 U.C. Davis J. Juv. L. &

99

Pol'y 281, 286 (2009); Carolyn Ellis Staton, *Sex Discrimination in Public Education*, 58 Miss. L.J. 323, 334 (1989). Talk about ambiguity.

To ask whether the majority's interpretation or another is better simply misses the boat. The question is instead whether Congress has, "*in unmistakably clear terms*," placed this condition on federal funding. *Com. of Va., Dep't of Educ. v. Riley*, 106 F.3d 559, 566 (4th Cir. 1997) (en banc) (emphasis in original). "At the very least," all this evidence "show[s] that the statutory scheme is profoundly ambiguous" as to dress codes "and that Congress has not spoken with the clarity that *Pennhurst* requires[.]" *Mowbray v. Kozlowski*, 914 F.2d 593, 600 (4th Cir. 1990).

B.

All this focus on ambiguity cannot be divorced from the federalist structure that clarity protects. Clarity is of the utmost importance here, for the very independence of local school systems—and of our federalist structure—depends upon it. As discussed, CDS is not a state actor. Yet North Carolina certainly has the right to create educational options which operate outside of its direct control. Exercising this right is in no sense a waiver of the state's sovereign status. The federal government ought not be allowed to craftily work around that right, bringing North Carolina's independent schools under its own dominion by using its virtually unlimited power to collect and spend.

This case provides a perfect example of using federal powers to wrench our Constitution from its founding shape by hammering the constituent sovereignties in our system into one conforming federal mold. As the Department of Education rightly recognized, a single dress policy in an individual school is an issue for local determination,

100

not federal control. Providing education for our nation's youth is central to states' sovereignty. *See United States v. Lopez*, 514 U.S. 549, 564 (1995); *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 29–30 (1973); *Riley*, 106 F.3d at 566. It is critical that states be given flexibility to fulfill this role. *See Sebelius*, 567 U.S. at 536 ("State sovereignty is not just an end in itself: Rather, federalism secures to citizens the liberties that derive from the diffusion of sovereign power.") (quoting *New York v. United States*, 505 U.S. 144, 181 (1992)).

North Carolina has exercised its sovereignty by choosing to make a diverse assortment of school options available to its students, including independent charter schools. And it should be able to do so without undue federal interference, so that states "may perform their role as laboratories for experimentation to devise various solutions where the best solution is far from clear." *Lopez*, 514 U.S. at 581 (Kennedy, J., concurring). In turn, those charter schools have every right to make reasonable decisions about the ordinary day-to-day operation of their schools, again without undue federal interference. Such dispersion of educational decision-making to an even more local level—all the way down to individual schools and parents—is in keeping with the "choice, competition, and innovation" so fundamental to federalism. *See* Kamina Aliya Pinder, *Federal Demand and Local Choice: Safeguarding the Notion of Federalism in Education Law and Policy*, 39 J.L. & Educ. 1, 24–25 (2010) (quoting Robert A. Schapiro, *Toward A Theory of Interactive Federalism*, 91 Iowa L. Rev. 243, 267 (2005)). To say that the federal government may prescribe student dress codes for the untold thousands of schools in the fifty states is to say

101

that little lies beyond its competence, even where its directives themselves come clothed in ambiguity.

To hold otherwise is to allow the inevitable momentum toward federal hegemony to surge onward. Almost unawares, we find ourselves in a world where the enumerated federal powers are incrementally transformed into a general federal police power—and where the federal government's sheer financial leverage allows it to shunt differing perspectives to the sidelines. *See Sebelius*, 567 U.S. at 536 (Spending Clause "must be read carefully to avoid creating a general federal authority akin to the police power."). Much of the growth of federal power is an altogether necessary response to international and interstate challenges and moral imperatives the Framers never envisioned or addressed. But not all of it is. The quotidian operations of state and local schools are not intuitively federal subjects, and where law so firmly aligns with intuition, the outcome should be clear.

## IV.

Charter schools are proving quite popular, so much so that they are becoming difficult to restrict through legislative means. So the effort seems to be to control them through regulation and litigation, as this case makes plainly manifest.

No doubt the fight against the CDS dress code has only begun. No doubt this dress code will be attacked as retrograde, a threat to progress of all sorts. No doubt there will be sincere differences of opinion as to this. But our nation has prospered when all its citizens could freely exercise their diverse faiths. Perhaps a greater freedom of choice will likewise lessen the tensions that arise when educational establishments seek to bend school systems to their singular ends. I do not know how the political debate over school choice will

102

evolve. I do know, however, that this court should not subject this charter school to the slow strangulation of litigation. I would return this case to the district court with directions that it be dismissed.